WILLIAM P. BRIGGS v. SAVEDIA W. TAYLOR.

*Negligence. Liability of officer for preservation and care of property attached. Degree of diligence required of attaching officers, and other bailees for hire.*

The question of negligence may, in some cases, be withdrawn from the consideration of the jury, as where there is no testimony tending to show it; or where a given course of conduct is admitted which results in detriment, and no excuse is given. In the latter case the liability follows, as matter of law, and there is nothing for the jury but a question of damages.

Briggs *v.* Taylor.

Where a carriage, wagons and sleighs, which were not past use, were attached and were allowed by the officer to remain during a winter in the open fields, wholly exposed to the weather, for which no excuse was offered except the difficulty of finding a place for them under cover, the jury should have been instructed that the officer was liable for the damage done to the property; and it was error to submit to the jury the question, whether or not the officer exercised proper care.

The degree of diligence required of attaching officers and other bailees for hire is that which prudent men exercise in the conduct of their own affairs.

This definition, which is now almost uniformly used by the English judges, seems more definite and just, and less liable to be misunderstood by juries, than the terms common and ordinary care or diligence. REDFIELD, CH. J.

ACTION ON THE CASE against the defendant, as sheriff, for the neglect of his deputy in preserving and taking care of property of the plaintiff which the deputy had attached. Plea, the general issue; trial by jury, September Term, 1853,— PECK, J., presiding.

Among other articles attached by the defendant's deputy was a two-horse pleasure carriage and several wagons and sleds which the plaintiff's testimony tended to show were removed at the time of their attachment to the premises of a third person, and there left in the open fields, where they were allowed to remain from September, 1851, to the following April, exposed to the rain and snow, &c. The defendant's testimony tended to show that the carriage was an old one, and that the wagons and sleds were, as the witnesses described them, "not very new nor very old;" that the deputy applied to the person upon whose premises they were removed for shed room for them, but was refused; and that they were not much injured by their standing out for the time they did. The plaintiff insisted, as a matter of law, that, as the officer had permitted the property to remain exposed to the weather and unprotected as herein above mentioned, whereby it had suffered damage and become reduced in value, that it constituted such a neglect of duty on the part of the deputy, as would render the defendant liable in this action. The court left the question to the jury to find whether the deputy exercised ordinary care and prudence in taking care of, and in the preservation of the property attached; and in reference thereto, gave the jury, in substance, the following instructions; that it was the duty of an officer attaching property to use ordinary care and prudence in the custody and preservation of

the property attached, and that ordinary care and prudence was such care and prudence as men of ordinary care and prudence usually exercised over their own property; and that it was for them to say whether it was common or ordinary care and prudence to keep such property as the carriage, wagons and sleighs in question in the manner in which it was kept. Verdict for the defendant. Exceptions by the plaintiff.

*W. P. Briggs, pro se.*

The law, and not the jury, is to determine what is a prudent and proper care of property so in the hands of the officer, on a given admitted state of facts; hence the jury should have been told that, if they found the carriages and sleds were suffered by the officer, to remain in the open field from September, 1851, to April, 1852; the same being the worst season of the year for the decomposition of wood, that then the plaintiff must recover, unless they also found that there were no roofs of shelter, nor boards to make one of to be found in the country.

The charge as to the degree of diligence required, was too indefinite, and too general.

No such charge as this can be found in any of the reports on this subject.

Judge McLean, in his own reports, Vol. 3, and pages 354 and 342, charges the jury that the officer is bound to use all that diligence, prudence and care which *careful* men, (not ordinary men,) use with their own property. See also, 2 Adolph. & Ellis 260; 4 B & Alderson 30, *Batson* v. *Donavan*; 5 Denio. 586, *Brown* v. *Hanford*; 1 Fairfield 20, *Well* v. *Green*.

*G. F. Edmunds* for the defendant.

The question whether the defendant's deputy was wanting in ordinary care and prudence, was one of fact which it was the constitutional right and duty of the jury to decide; and it would have been an unwarrantable usurpation of power in the court below, to have interfered with the exercise of that right and duty; 14 John. 304, *Foot* v. *Wiswall*; 15 Pick. 291, *Coffin* v. *Ætna Insurance Company*; 11 Vt. 621, *Lindsay* v. *Lindsay*; 8 Met. 437, *O'Kelley* v. *O'Kelley*; 18 Vt. 18, *Hopkinson* v. *Holmes*; Story Bail. § 11.

Actions for injuries from insufficient highways, afford a uniform illustration of this rule; 6 Vt. 245, *Leicester* v. *Pittsford*; 22 Vt. 458, *Willard* v. *Newbury*.

As to what constitutes ordinary diligence, the court fully instructed the jury, and gave to these terms the definition universally recognized; Story Bail. § 11; 7 B. Monroe, 661, *Swigert* v. *Graham*, (8 U. S. D. 43;) 23 Vt. 387, *Quimby* v. *Vt. Central R. R. Co.*

The opinion of the court was delivered by

REDFIELD, CH. J. In regard to the carriage, and the wagons and sled, which were not past use, although the carriage was an old one, and the wagons and sleds were described by the witnesses, as being "not very new nor very old," it seems to us there was no testimony in the case tending to show that an officer who held them under attachment, would be fully justified in letting them stand outdoors all winter. We could scarcely conceive of a state of facts justifying such a course, short of absolute necessity, which, it would seem, would never occur when boards could be obtained. And where there is no testimony, tending to excuse an officer in such case, it becomes a mere question of damages. Questions of negligence are said in the books to be mixed questions of law and fact, but where there is no testimony tending to show negligence, or where a given course of conduct is admitted, which results in detriment, and no excuse is given, the liability follows, as matter of law, and there is nothing but a question of damages for the jury.

We do not think a judge is ever bound to submit to a jury questions of fact, resulting uniformly and inevitably, from the course of nature, as that such carriages will be injured more or less by exposure to the weather during the whole winter, or that a judge is bound to submit to a jury the propriety of such a course, when it is perfectly notorious that all prudent men conduct their own affairs differently. This uniformity of the course of nature or the conduct of business, becomes a rule of law. But while there is any uncertainty, it remains matter of fact, for the consideration of a jury. It could not be claimed, that it should be submitted to a jury whether cattle should be fed or allowed to drink, or cows be milked.

II. As, from the determination of the first point, a new trial

becomes necessary, it will be of some importance to inquire in regard to the proper mode of defining the duty of the officer in keeping goods attached on mesne process. It is usually defined in practice, in this state, certainly so far as we know, much as it was in this case, by the use of the terms, " ordinary and common care, diligence, and prudence." And it is probable enough, these terms might not always mislead a jury. But it seems to us, they are somewhat calculated to do so. If the object be to express the medium of care and prudence among men, it is certain these terms do not signify a fixed quality of mediocrity even. For if so, they would not be susceptible of the degrees of comparison, as more ordinary and most ordinary, which medium, and middle, and mean, are not. The truth is, that ordinary and middling and mediocrity even, when applied to character, do import, to the mass of men, certainly, a very subordinate quality or degree; something quite below that which we desire in an agent or servant, and which we have the right to require in a public servant, especially. A man who is said to be middling careful, or ordinarily careful, is understood to be careless and is sure never to be trusted.

We have been at some pains to look into the English books upon this point, and although there may be some exceptions, the general rule certainly is, among the English judges, to express common care and ordinary care by terms less liable to misconstruction, and, as we think, likely to be more justly appreciated by juries. In *Duff* v. *Budd,* 3 Brod. & Bing. 177, the rule is laid down by Dallas, Ch. J., to the jury, in these words : " Gross negligence is where the defendant or his servants have not taken the same care of the property as a *prudent man would have taken of his own,*" and the judgment is affirmed by the full bench. In *Riley* v. *Horne,* 5 Bing. 217, Best, Ch. J., says of a carrier, " the notice will protect him, unless the jury think that *no prudent person,* having the care of an important concern of his own, would have conducted himself with so much inattention, or want of prudence." In *Batson* v. *Donovan,* 4 Barn. & Ald. 32, the same learned judge lays down the rule thus: " They must take the same care of it that a *prudent man* does of his own property. This is the law with respect to all bailees for hire or reward." In *Wyld* v. *Pickford,* 8 M. &. W. 443, Parke B. seems to claim a distinction between gross negligence

and ordinary neglect, but admits that ordinary neglect may be correctly defined in the above cases. But in *Hunter* v. *Debbin*, 2 Queen's B. 644, Denman, Ch. J., said, in regard to gross negligence, " it might have been reasonably expected that something like a definite meaning should have been given to the expression," " in none of the numerous cases referred to on the subject is any such attempt made, and it may well be doubted whether between ' gross negligence,' and negligence merely, any intelligible distinction exists." But the English cases all seem to agree in defining ordinary negligence as that which a *prudent man* does not allow in the conduct of his own affairs, and most of the later cases, where the question has arisen, both English and American, repudiate the old attempt to distinguish three distinct degrees of diligence and the correlative degrees of negligence. In *Wilson* v. *Brett*, 11 M. & W. 113, Baron Rolfe makes some very pertinent remarks upon this subject. " I said I could see no difference between *negligence* and *gross* negligence, that it was the same thing, with the addition of a vituperative epithet." And in *Austin* v. *The Manchester R. R.* 11 Eng. L. & Eq. 513, Cresswell, J. refers to the language of Lord Denman quoted above, with approbation, and in the *Steamboat New World* v. *King*, 16 Howard U. S. 474, Mr. Justice Curtis seems to adopt a similar view in regard to these distinctions being more or less unintelligible, and in practice often leading to misconstruction and misunderstanding. It seems too that these distinctions are repudiated by many of the continential jurists in Europe, as producing more uncertainty than they cure ; 6 Toullier's Droit Civile, 239, 11 ; id 203 ; and although it seems we have adopted these distinctions in the degrees of diligence and negligence from the Roman civil law, I do not find the commentators on that law adopting our loose manner of expressing what is required of a bailee for hire. Domat, part 1, book 1, tit. IV, sec. VIII, art. III, thus expresses the care of such bailees : " He who undertakes to keep cattle, ought to preserve that which is entrusted with all the care that is possible to be taken by persons who are the most watchful and diligent." And this is really synonymous with the rule adopted by the English courts. Mr. Justice Story, Bailments, §11, in order to maintain the old definition of three grades of diligence, defines it much in the manner it was done in the present case.

"Common or ordinary diligence is that degree of diligence which men in general exert in respect to their own concerns," which certainly leaves upon the mind a different impression from the definition of Domat and the English judges, and we cannot but regard it as one calculated to mislead juries ; and this very writer, in § 13, adopts the diligence of "prudent men," as the measure of common diligence, and it seems to us nothing short of this will do justice in a case like the present.

It may with some plausibility be said, that one who employs a man known to the employer to be habitually indifferent to the management of his own concerns, has no right to expect him, all at once, even for reward, to assume a wholly different character, and the jury would be likely so to decide, the question being ordinarily one of fact, when the testimony raises any doubt ; and when one employs a man of skill and talent in the management of his own affairs, he may justly expect him to exert the same skill and talent, to the same extent in the management of the business which he undertakes for others ; and in the case of a public officer who is selected for his fitness for the particular trust, every one may justly expect all the care and diligence, which men entirely competent and careful could reasonably be expected to exert in their own business of equal importance.

The absurdity of this measure of duty in a public officer will become sufficiently obvious, if we advert to the form of the oath, or of the official bond of public officers.  What should we think of having one sworn or giving bond to perform his duty as common men ordinarily do such things.  This certainly sounds very different from the official oath, "that you will faithfully execute the office to the best of your judgment and ability," and an official bond obliges officers to the strictest, most faithful performance of all of their duties.  Any other standard would sound absurd, and it is obvious to us, that the case of *Bridges* v. *Perry*, 14 Vt. 262, was not intended to impose any different rule of liability upon officers in keeping property.  As said in Drake on Att. § 273, "The officer must comply with all the requisitions of the law," (one of which is, to keep safely, property attached on mesne process, and restore it when required by law,) "or show some legal excuse for not doing so."  Hence in *Sewall* v. *Marston*, 9 Mass. 530, an offi-

cer was held bound to keep property attached on mesne process, five years before, ready for sale on the execution, and in *Tyler* v. *Ulmer*, 12 Mass. 163, it was held, an officer could not in such case excuse himself for not producing cattle, by showing that from the scarcity of fodder they could not have been kept alive.

Any injury or loss, in such cases, renders the officer *prima facie* liable, and imposes upon him the burden of showing some valid excuse; *Logan* v. *Matthews*, 6 Barr 417; Story on Bail. § 411; *Platt* v. *Hubbard*, 7 Conn. 501, *Burt* v. *Miller*, 13 Barbour 482. There is undoubtedly some contradiction in the cases, in regard to the burden of proof of negligence in the ordinary case of bailments for hire, but there can be no doubt, we think, in regard to the question in the present case. This is expressly so laid down in *Bridges* v. *Perry*. The court in that case, as will be obvious from a careful examination, had no purpose of excusing this class of officers from any degree of care and diligence, which careful men would expect under the circumstances.

And this, it seems to us, is the true measure of liability in all cases of bailment. The bailee is bound to that degree of diligence, which the manner and the nature of his employment makes it reasonable to expect of him; anything less than this is culpable in him, and renders him liable. The conduct of men in general in the region where the attachment was made, may be some guide to what ought to be required of the defendant in keeping property attached. We mean, of course, prudent and careful men, for no one is expected to go very essentially beyond the common custom of the country in such matters, as it must be attended with extraordinary expense, and a question might thereby arise as to the propriety of incurring such expense.

Judgement reversed, and case remanded.