EMMA TAYLOR *v.* GRAND TRUNK RAILWAY COMPANY.

After the entry of a suit by a minor by her next friend, she died and her administrator was admitted as the party to prosecute the suit ; it was held that the wife of such next friend was a competent witness for the plaintiff :

Held also that it was too late to object to her competency after the direct examination in her deposition had been read, the counsel being aware of her situation at the commencement.

The admission of the representations of a sick person should be confined to such expressions as furnish evidence of the present condition of the patient, excluding carefully every thing in the nature of a narrative of what is past.

The statement that a person was lamer in the morning than the day before is not matter of opinion but a statement of a fact, and not objectionable.

The admissions of the father of the person alleged to be injured and bringing suit for it, made before her death, are not admissible against her administrator, unless it be shown that the father is the real party in interest for whose benefit the suit is prosecuted.

If this be shown the admissions would be competent, although when they were made the father had no interest.

But the mere fact that the estate of the daughter would descend to the father subject to the claims upon it, would not make him the party to the suit so as to render his admissions competent.

The testimony of a physician that injuries from railroad accidents were more severe than from other causes though bearing the same external appearance, is admissible although his knowledge is derived from study alone.

On the cross-examination of a witness offered by the railroad, and who had charge of the section where the alleged injury happened from a defective rail, it is proper to ask him if he was short of iron at the time.

Common carriers of passengers are bound to the exercise of the utmost care and diligence of very cautious persons, and are responsible for any, even the smallest, negligence.

The standard of care and diligence required of a railroad in carrying passengers does not depend upon its pecuniary condition or the amount of its revenues, but it is bound to provide a track, rolling stock, and all other agencies suited to the nature and extent of the business it assumes to do.

A direction to the jury that a railroad must use such a degree of care as is practicable, short of incurring an expense which would render it altogether impossible to continue the business, is erroneous, and calculated to mislead the jury.

When an injury upon a railroad is caused by the gross negligence of the corporation, the jury may, if they think proper, award exemplary damages.

CASE to recover for injuries alleged to have been sustained by Emma Taylor, in Sept. 1866, while travelling on defendants' road. In the writ, dated Oct. 3d, 1866, plaintiff was described as a minor suing by A. W. Pope, her next friend. At April Term, 1867, the death of plaintiff was suggested, and John Bailey, 2d, her administrator, was admitted to prosecute the action.

I. Plaintiff offered the deposition of Elizabeth A. Pope, taken after the death of Emma Taylor. Defendants had appeared by counsel at the caption, and had raised no objection to the competency of the witness. No objection was raised at the trial until the plaintiff had read to the jury, the direct examination of deponent, when defendants, at the reading of the first question on cross-examination, (" Is not Albert W. Pope, who prosecutes this suit, your husband?" Answer—" He is,") objected to the competency of the deponent, because she was the wife of A. W. Pope. The objection was overruled, subject to defendants' exception.

II.   The following testimony relative to Emma Taylor's condition after the injuries were alleged to have been received, was admitted, subject to defendants' exception.   Deposition of Abby C. Jennison—answer to interrogatory 5 :   " I was out and in the room often till about 12 o'clock.   At that time she said she had not had any rest.   She seemed to suffer and seemed weak and debilitated."   (This was on the night after the accident.)   Answer to interrogatory 20 :  " She did not seem to be excited, frightened."   (This was within a few hours after the accident.)   Deposition of Mrs. Unity P. Crane who slept with Emma Taylor, the night after the accident.   Interrogatory 18 :  " How was her lameness in the morning as compared with the day before, from what you saw and observed in her motions, and your examination made ?" Answer—" She was lamer in the morning."

III.   It appeared that Emma Taylor died under twenty-one years of age, unmarried, and without issue.   Defendants' offered to prove declaration made after the accident, and before the death of Emma, by her father, who is still living.   The evidence was excluded, subject to defendants' exception.

IV.   Dr. Harris testified in substance, subject to defendants' objection, that injuries received in railroad accidents were more severe than injuries received from other causes, and bearing the same external appearance.   Dr. Harris had previously testified that he was a practising physician, that he had not attended persons injured on railroads, and that his knowledge on the subject was derived from reading.   The objection that Dr. H. was not an expert on the subject was not specifically taken. If it had been, the court would probably have ruled that he was an expert.   Defendants' had previously objected to testimony on the subject from another physician who had had practical experience in attending on persons injured on railroads.

V.   It was admitted that the accident was caused by the breaking of a rail.   Subject to defendants' exception, plaintiff was allowed, on cross-examination, to ask the foreman of the five mile section where the accident occurred, " Were you short of iron at the time of the accident?" Answer to the above and other questions :  "I had iron to repair that place —a whole old rail, but a good one—shouldn't have put in a new one if I had had it—think I hadn't any new rails on hand at that time, not certain."

VI.   The jury were instructed as to defendants' liability, in substance as follows :  The burden of proof is on the plaintiff to show that the accident occurred under such circumstances that the defendants were liable for the consequences ; defendants are not insurers, and are not liable if they have been in no fault, but they are liable for the smallest negligence ; they must provide a good track, and if there be the least failure in this, they are answerable for any injury that may happen in consequence.   Defendants are bound to use the highest degree of care which a reasonable man would use ; this does not mean the utmost degree of care which the human mind is capable of imagining, or in other words that care enough must be taken to render the passengers perfectly safe ; such a rule would require so great an expenditure of money, and the employment of so many hands.   Defendants must use such a degree of

care as is practicable, short of incurring an expense which would render it altogether impossible to continue the business. The law does not require such particular precaution as it is apparent after the accident might have prevented the injury, but such as would be dictated by the utmost care and prudence of a very cautious person before the accident and without knowledge that it was about to occur. Defendants must use the highest degree of practicable care and diligence that is consistent with the mode of transportation adopted. They are not obliged to use every possible preventive that the highest scientific skill might have suggested. It is said that they must use the best precautions in known practical use to secure safety, the most approved modes of construction and machinery in known use in the business; but this doctrine must be taken with the qualification, that they are not obliged to introduce improvements if the expense of introducing them is much greater in proportion, than the increase of safety thereby attained.

Defendants excepted in these words:—"To the charge of the court as to the liability of common carriers of passengers by railroad."

VII. Evidence was introduced by plaintiff, tending to show that the track was "very much curved" at the place of the accident; that the rail which broke was on the inside of the curve, next the Ammonoosuc river, and about fifteen or twenty feet from the river; that this rail appeared very much worn and battered or broomed, from one to two feet from the end; that it was a "U" rail; that some two feet of the rail broke off, and that two passenger cars went off the track and part way done the bank, being almost bottom side up when they rested; that the train was going at the rate of not more than twenty miles an hour when the accident occurred.

Defendants introduced evidence tending to show that the breakage was occasioned by a hidden defect in the rail, which they were not in fault for not detecting; but although several employees of the defendants, including the chief engineer of that portion of the road were on the spot immediately after the accident and saw the rail, (and the defendants sent an eminent physician from Montreal to look after the persons injured,) it did not appear that defendants preserved the rail, and the rail was not produced by them at the trial.

The jury were instructed, that if they found that the accident was caused by the gross negligence of defendants, they might, if they chose, give exemplary damages, but that they were not bound to do so. Part of the decision in *Hopkins* v. *At. & St. L. R. R.*, 36 N. H., 9, beginning on the third line from the bottom of page 17th, and ending on the eleventh line from the top of page 19th, was read to the jury, (omitting authorities,) to be considered by them only as a statement of reasons which had induced the court to allow juries to give exemplary damages in cases of gross negligence.

Defendants excepted "to the charge of the court in regard to exemplary damages," and also took the exception, "that the question of exemplary damage ought not to have been submitted to the jury, upon the evidence in the case, and that it was error to do so."

The jury were requested, in case they found for plaintiff and gave

exemplary damages, to assess the actual and exemplary damages separately. The jury returned a verdict for plaintiff, and assessed the actual damages at five hundred dollars, and the exemplary damages at eight hundred and fifty-eight dollars and fifty cents. A verdict was then taken for plaintiff, damages $1358.50, with leave to plead a *remittitur*, if plaintiff should hereafter desire to do so.

Defendants move to set aside the verdict on account of the foregoing rulings, and also " because the exemplary damages assessed by the jury, were excessive and beyond all measure."

*Whidden & Haywood, Ray & Ladd*, for plaintiff.

*Fletcher* and *Bingham*, for defendants.

BELLOWS, J.    The first question is whether Mrs. Pope was a competent witness. On that point it appears that the suit was brought in October, 1866 by the minor Emma Taylor, who sued by her next friend A. W. Pope, the husband of the witness Mrs. Pope; and that at the April Term, 1867, the death of Emma Taylor was suggested, and her administrator, John Bailey 2d, admitted to prosecute the action. The trial was at the August Term, 1868, and the deposition of Mrs. Pope was taken after the plaintiff's death.

The objection was that the husband was originally a party and liable for the costs of the suit. If this were so originally, it is clear that he ceased to be a party at the April Term, 1867, when the administrator was admitted to prosecute the action. In principle it stands like the case of an administrator removed from the trust pending a trial to which he is a party, and the appointment of another person who is admitted to take his place as such party. Here, as was held in *Wiggin* v. *Moulton, Administrator*, erroneously reported as *Wiggin* v. *Plummer*, 31 N. H. 265, the former administrator ceases to be a party altogether, and unless otherwise interested was a competent witness under the old law. That being the case there was at no time any liability on the part of A. W. Pope for any thing more than the costs up to April Term, 1867, and as no judgment in chief can now be rendered against him, he having ceased to be a party, we are not aware of any mode of enforcing against him a claim for any part of the cost; and such was the decision in *Wiggin* v. *Moulton*, before cited. It is quite obvious that no judgment for costs could be rendered until the trial is ended, and then judgment must be against the then party, and such was clearly the conclusion of the court in the case cited.

If the *prochein ami* was liable for costs up to the time of the plaintiff's death, it might be equitable to require the administrator to furnish some equivalent security, and by the Revised Statutes, chap. 191, sec. 7, the court has power to order it, and so it is by the General Statutes.

In accordance with this view it has been held that a next friend will not be permitted to withdraw from a cause in order to become a witness without security for the costs up to that time being furnished. *Witts* v. *Campbell*, 12 Ver. 493.

Upon the point whether the next friend is liable for the costs there is some conflict in the authorities, but the preponderance we think is in favor of his being liable; but however this may be we are of the opinion that in this case no claim for costs after the admission of the administrator of the plaintiff could be enforced against the *prochein ami*, and that consequently the wife was a competent witness.

Besides, it is by no means clear that the objection may not be regarded as waived. The examination in chief was read without objection, and it is obvious that the counsel for defendant knew the witness was the wife of the next friend, for the fact was drawn out by the cross-examination of one of them; and the judge would have been well warranted in finding that the fact was known when the deposition was commenced to be read; and if so the objection would be considered as waived.

In respect to the declarations of Emma Taylor testified to by Abby C. Jennison, the rule is well settled here that representations by a sick person of the nature, symptoms and effects of the malady under which he is laboring at the time are admissible. *Howe* v. *Plainfield*, 41 N. H. 135; *Perkins* v. *Concord R. R.* 223; 1 Greenl. Evi. sec. 102. Such evidence is admitted because these expressions are the natural language of suffering and pain which often could not be otherwise proved. This evidence, however, is not to be admitted beyond the necessity upon which the rule is founded, and therefore everything in the nature of a narrative of what is already past is to be carefully excluded, and the testimony confined to such expressions as furnish evidence of the present condition of the patient. *Bacon* v. *Charlton*, 7 Cush. 586, and *Chapin* v. *Marlborough*, 9 Gray 244.

Tested by these rules the statement of Miss Taylor that she had not had any rest was not strictly admissible. It is true, as suggested by the plaintiff's counsel, that there is included in the expression the idea that she was *then* unable to sleep, and so far it would not be objectionable; but it relates also to time that was past, and if admitted it would be difficult to tell where to stop. Still it does not seem to be at all material, and on that ground we should hesitate to set aside the verdict for that cause.

The statement of Mrs. Crane that Miss Taylor was lamer in the morning than the day before was not objectionable as matter of opinion. It was a statement of a fact open very largely to common observation. In a very great proportion of cases, indeed, it would be impossible to describe to a jury the extent of the lameness at the different times so as to be intelligible, and yet the difference might be perfectly obvious to the eye. See *Whittier* v. *Franklin*, 46 N. H. 23. In *Eastman* v. *Amoskeag Co.* 44 N. H. 143, 155, it was held that a witness might be allowed to state that the water in Merrimack river ran higher on the plaintiff's land the year in question than during previous years. See also *Willis* v. *Quimby*, 31 N. H. 485.

Upon the subject of the father's admissions it appears that they were made during the daughter's life, and when he had no interest in the suit which she had commenced by her next friend, A. W. Pope; and the

competency of those admissions is urged upon the ground that the avails of this suit now prosecuted by the daughter's administrator, will go to the father as the sole representative of the daughter, and that the father thus became the party in interest.

At the time the admissions proposed to be proved were made, the father · occupied no position that would render his admissions competent. In *Harney* v. *Donnelly*, 12 Gray's Rep. 361, it was held that the declarations of the father in respect to injuries received by his minor son were not admissible in favor of the defendant in a suit afterwards brought by the son by the father as his next friend. This was put upon the ground that there was no proof that up to the time of those declarations the father was the son's agent.

If in this case the son was regarded as the real plaintiff it would seem to be inequitable that he should be affected by the declarations of his father at a time when he was in no way the agent or representative of the son. If, however, the father after such declarations became the sole party in interest to a suit for injuries to the son, a very different case would be presented.

In the case of negotiable paper transferred after it is dishonored, and sued by the endorsee, the declarations of the endorser made while he held the bill or note are admissible against the endorsee, upon the ground that they are the admissions of one under whom the endorsee derives his title. He will not, however, be affected by admissions of the endorser after the transfer, nor by his statements made before he became the holder of the bill or note.

If the endorser retains an interest in the bill or note, as if he has pledged it for less than the amount due, then his declarations made after the transfer may be received to affect his own interest, but not to affect the interest of the endorsee. 1 Greenl. Evi. sec. 190, and notes and cases; *Bond* v. *Fitzpatrick*, 4 Gray, 89, 92; *Sylvester* v. *Crapo*, 15 Pick. 92.

If a suit is brought by the holder of such bill or note, the defendant, we think, may prove the admissions of such holder, made *before* as well as after it came into his possession. At common law the defendant could not call the plaintiff to prove the fact so admitted, and it certainly is just that he should be allowed to prove the admissions, nor can we perceive any legal objection to it. On the contrary the general principle is that the admissions of a party against himself are competent, and we are not aware that this is limited to admissions made while he held the claim in question. Whether his admissions shall affect a third person is a very different question as we have already seen.

Upon the whole, if under the circumstances the father is to be considered the party in interest here, we are of the opinion that his admissions, though made before he acquired such interest, are competent to be proved by the defendant.

The true rule is, we think, laid down in *Plant* v. *McEwen*, 4 Conn. 544, in these words: "On general principles, the declarations and acts of the party of record, whether he had or had not an interest in the subject at the time of making or performing them, are admissible in evidence against him;" and see Starkie's Evi. 4th part, page 30.

The question is, then, whether the father was to be regarded as the party in interest in this cause. If the disposition of the estate is to be governed by our statute of distributions, then it would seem that the whole estate of the daughter including the claim here in suit would go to the father. It does not appear, however, that the suit is prosecuted by him, nor does it appear that he has the sole interest in it, or that others would not have claims upon the amount recovered, as creditors of the deceased or by way of lien for costs and disbursements in this suit.

In the case of *Plant* v. *McEwen*, 4 Conn. 544, before cited, which was a suit upon a probate bond given by the defendant as executor of his father, the plaintiff offered in evidence the acts of the defendant before the testator's death in order to establish a claim against the estate. The evidence was received at the trial, and on motion for a new trial it was held that although the evidence might be competent if it affected the interests of defendant alone, it was not admissible to affect the heirs of the testator, and a new trial was granted.

In *Carleton* v. *Patterson*, 29 N. H. 580, which was a suit against an officer for the keeping of property attached by him on mesne process, it was decided that the admissions of the creditor for whom the attachment was made were not competent without showing that he was the party in interest—the party who really carried on the controversy under a party who had no concern in it, and was merely a nominal party, or under one who was fully indemnified. It appeared also that the creditor had appeared specially to defend against the suit being sustained upon a writing between the plaintiff and defendant, on which the court instructed the jury that the suit could not be maintained. The court held the admission was rightly rejected. So in *Barker* v. *Remick*, 43 N. H. 235, 239, which was a suit against the sheriff for default of his deputy, it was held that this fact alone did not make the deputy a party, he not having taken upon him the defence.

Upon these authorities it does not appear that enough has been shown to give the father the character of a party in interest, or to make his declarations admissible against the administrator or the persons he may represent. Should he be shown to be the party in interest for whose benefit the suit is prosecuted, his admissions would be competent the same as if he were the party of record; for the law, with a view to evidence, regards the real parties. Starkie's Evi. 4th part, page 31–32, and *Carleton* v. *Patterson*, before cited; 1 Greenl. Evi. 180.

The testimony of Dr. Harris, we think, was admissible, and comes within the principles laid down in *Jones* v. *Tucker*, 41 N. H. 546. His opinion was about a matter in relation to which inexperienced persons would be unlikely to form a correct judgment without such assistance; and one also, which so far partakes of the nature of science as to require a course of study and observation to attain a knowledge of it. The purpose of the testimony was to make it appear that injuries by railroad accidents were more severe than other injuries exhibiting the same external appearance; and to form an intelligent opinion upon the subject a person would need to learn by study or observation the char-

acter of the various injuries to which the human body is exposed; and also the circumstances which would tend to aggravate the effects of such injuries, such as a shock to the nervous system caused by the application of great force. It would seem indeed to be quite obvious that there ought to be a course of careful study to enable a person to form a reliable opinion upon the subject. If injuries by railroad accidents are usually attended with great force and violence, such as to affect seriously the nervous system, it might well be that injuries occasioned by such accidents might be more serious than others of the same apparent severity. At all events it is manifest, we think, that the subject is one that needs the aid of scientific study and research in order to form a reliable opinion.

It is often said that a gun shot wound is more serious than a sabre cut of apparently equal severity; but whether it be so or not the experienced surgeon is best fitted to decide, and the same may be said in respect to the matter now in question.

Upon the cross-examination of defendants' witness, the foreman of the section where the accident happened by the breaking of a defective rail, the plaintiff was permitted to ask him if he was short of iron at the time of the accident. If the answer showed that no suitable iron was provided to enable the witness to repair the track, and there was evidence tending to show that a new rail was needed, it would certainly be evidence for the jury to consider upon the point of negligence, and the degree of it. If on the other hand the answer went to show that suitable iron had been provided, the defendants had no cause to complain; and in either event there was no error.

The great question in the case is upon the instructions to the jury in respect to the duty of the defendants; the court having apparently answered that the carriers of passengers by railroad are bound to exercise the highest degree of care and diligence in the conduct of their business, and that they are responsible for the smallest negligence.

Upon a careful examination of the authorities we think this general view of the duties of such carriers, taken in the charge, is correct. It is applicable indeed to the carriers of passengers by stage coaches, where the rate of speed is not much above six miles the hour, and it is very obvious that a higher degree of care and skill is demanded in the transportation of passengers by steam upon a railroad, where the speed is so much greater.

In the English courts the proprietors of stage coaches are held to a high degree of care and skill. In *Aston* v. *Heaven et al.*, 2 Esp. Rep. 533, it was said, per Eyre, C. J., that the driver was answerable for the *smallest negligence*. In *Christie* v. *Greggs*, 2 Camp. 79, it was held that the undertaking of the carrier of passengers went no farther than this, that as far as human care and foresight could go, he would provide for their safe conveyance.

In *Crofts* v. *Waterhouse*, 3 Bingh. 319, Best, C. J., lays it down that the coachman must have competent skill, and must use that skill with diligence, must know the road, have steady horses, and a sufficient coach and harnesses; and if there be the least failure in any one of

these things the duty of the coach proprietor is not fulfilled and he is answerable for any injury or damage that may happen.

In *Sharp* v. *Gray*, 9 Bing. 457, the case was that the axletree broke in consequence of a defect in the iron, and it was left to the jury to determine whether there had been the vigilance in examining the axletree which was required by the engagement to carry the plaintiff safely; although from the language of the judges it seems to have been understood that the carrier was bound absolutely to see that his coach was road-worthy.

In *Brenner* v. *Williams*, 1 C. & P. 414, it was held by Best, C. J., that every coach proprietor warrants to the public that his stage coach is equal to the journey it undertakes, and that it is his duty to examine it previous to the commencement of every journey. See also *Israel* v. *Clark et al*, 4 Esp. 259, and 1 Starkie's Rep. 423.

The doctrine of the American courts is still more strict and explicit; and the general current of the authorities is, that the carrier of passengers is bound to the utmost care and diligence of very cautious persons, and is responsible for any, even the smallest, neglect; holding their undertaking to be to carry their passengers with safety as far as human care and foresight can go. This is distinctly laid down in Story on Bail. sec. 601, 601 *a*, and also in 2 Greenl. Evi. sec. 221, and in 2 Kent's Com. *601, *602, and Redfield on Rail., chap. 17.

This, it will be perceived, accords substantially with the definition of the highest degree of care required of bailees of goods, namely, that care and diligence which very prudent persons take of their own concerns. Story on Bail., sec. 16, Jones on Bail., 166, where it is said that slight neglect is the omission of that diligence which very circumspect and thoughtful persons use in securing their own goods and chattels.

It is true that doubts have often been expressed as to the utility of the theory which undertakes to define the degrees of negligence as slight, ordinary and gross, as in *Steamboat New World* v. *King*, 16 How. U. S. Rep. 474, and cases cited, where Curtis, J., expresses the opinion that the attempt thus to define the degrees of negligence had better be abandoned. So it is in *Briggs* v. *Taylor*, 28 Vt. Rep. 184.

But however this may be, some light may be gained in respect to the duty of carriers of passengers by steam, by considering some of the rules which have governed the courts in relation to bailments.

When the contract of bailment is mutually beneficial to both parties, as in the case of bailments for hire, pledges and the like, the bailee has been held for ordinary care; which is defined to be that care which every person of common prudence and capable of governing a family, takes of his own concerns; Jones on Bail., section 11, Story on Bail., section 11; while a bailee who alone receives a benefit, as in the case of the borrower, is bound to use extraordinary care.

In the case of the bailee of goods the obligation of care and diligence rises in proportion to the demand for it, although it still is only ordinary diligence that is required; but it is obvious that what will constitute ordinary care will be affected by the nature, bulk and value of the goods

bailed, for no one would expect the same care to be taken of a bale of cotton as of a box of jewelry or other thing peculiarly liable to be stolen or injured.

The case of common carriers of goods is an exception to the general rules applicable to bailments, and they are now regarded as insurers and liable for all losses except such as are caused by the act of God, or by the public enemies, and this is put upon the ground of public policy to guard against both negligence and collusion. *Moses* v. *Boston & Maine Railroad,* 24 N. H. 84.

Upon grounds of public policy also, the carrier of passengers is bound to exercise the highest degree of care and diligence. To his diligence and fidelity are entrusted the lives and safety of large numbers of human beings. He assumes the trust voluntarily, and for it receives a sufficient compensation; and we think it very apparent that in no case of the bailment of goods is there so great and imperative a demand for the utmost skill and diligence as from the carrier of passengers; especially is this true when the passengers are carried upon railroads by steam, for then in consequence of the greater speed the hazards to life and limb are largely increased.

In *The Philadelphia & Reading Railway Co.* v. *Derby,* 14 How. U. S. Rep. 486, the court says: "When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety require that they should be held to the greatest possible care and diligence, and whether the consideration be pecuniary or otherwise, the personal safety of passengers should not be left to the sport of chance, or the negligence of careless agents; any negligence in such cases may well deserve the epithet of gross;" and this statement is emphatically endorsed in the case of the *Steamboat New World* v. *King,* 16 How. U. S. Rep. 474, as resting not only on public policy but on sound principles of law.

In Redfield on Rail., section 149, note 5, the author says: "If the degree of care and watchfulness is to be in proportion to the importance of the business and the degree of peril incurred, it is scarcely possible to express the extreme severity of care and diligence which should be required in the conduct of passenger trains upon railways."

So in *Hegeman* v. *Western R. R. Co.,* 3 Kernan Rep. 9, it is held that the same precautions required in running a stage coach at the rate of six miles the hour would not be the test for a railroad car running thirty or forty miles the hour, and a similar view is adopted in 1 Smith's Leading Cases, 5th Am. Ed. 328; note to *Coggs* v. *Bernard.*

The measure of the care and diligence required of carriers of passengers, as laid down in Story on Bailments, Greenleaf's Evidence, Kent's Commentaries, and Redfield on Railways, as before cited, is fully sustained by the American cases.

In *Stokes* v. *Saltonstall,* 13 Peters' U. S. Rep. 181, the instructions to the jury were that it was incumbent on the defendant to prove that in managing the coach the driver acted with reasonable skill, and with the utmost prudence and caution, and that if the injury was occasioned by the least negligence or want of skill or prudence on his part,

the defendant was liable; and on error these instructions were held to be correct, the court saying that the undertaking is that as far as human care and foresight can go the carrier will transport the passengers safely.

In Massachusetts it is held that carriers of passengers are bound to use the utmost care and diligence to prevent the injury which human foresight can guard against; *Ingalls* v. *Bills*, 9 Met. 1, where it is said that the carrier is responsible for defects that might have been discovered upon the most careful and thorough examination. In *McElroy and wife* v. *Nashua & Lowell R. R.*, 4 Cush. 400, it was held that the defendants were bound to the utmost exact care and diligence, not only in the management of the trains and cars but also in the structure and care of the track, and in all the subsidiary arrangements necessary to the safety of the passengers. In Maine the carrier is held for such care as is used by very cautious persons. *Edwards* v. *Lord*, 49 Maine Rep. 279.

In Connecticut the carrier is held for the highest degree of care of a reasonable man. *Hall* v. *Conn. River Steamboat Co.*, 13 Conn. 320; *Derwent and wife* v. *Loomer*, 21 Conn. 253; *Fuller* v. *Naugatuck R. R.*, 21 Conn. 557, 576. In *Hadley and wife* v. *Cross*, 34 Vt. Rep. 586, the doctrine of *Ingalls* v. *Bills* was applied to a livery-stable keeper letting a defective carriage, namely, that he was liable if the defect could have been discovered upon the most careful and thorough examination. So in New York in *Hegeman* v. *Western R. R.*, 16 Barb. 353, it is held that the carrier is bound to conduct his business with all the care which human prudence and skill could suggest; and the defendants were held liable for injuries caused by a defect in a car made by a competent manufacturer, which defect was not discoverable upon a thorough examination after the car was finished, but might have been before, by bending the axle in which the defect was, and thus holding the carriers liable for the neglect of the manufacturer, and this decision was affirmed in 3 Kernan 9. In *Caldwell* v. *Murphy*, 1 Duer 241, the charge of the judge that the law exacted of the carriers of passengers extraordinary care and diligence, and that they were liable for an injury unless it happened from pure accident, was held to be entirely correct and that extreme care was required. In *Camden & Amboy R. R.* v. *Burke*, 13 Wend. 626, the court recognize the rule that the carrier is bound for the utmost care of very cautious persons.

In *Railroad Co.* v. *Aspell*, 23 Penn. 147, it was held that a railroad was bound to exercise the strictest vigilance, and must carry their passengers safely if human care and foresight can do it, and they are liable for any defect in the road, the cars, or the engines, or any other species of negligence whatever of which they or their agents may be guilty. So is *N. J. Railroad Co.* v. *Kennard*, 21 Penn. 203.

In *Galena & Chicago R. R.* v. *Yarwood*, 15 Ill. Rep. 468, it is said that the current of authorities both in England and America is uniform in holding these carriers to the utmost prudence and caution; holding them liable for the slightest negligence, and that the diligence of cautious persons is not enough.

In *Galena & Chicago R. R.* v. *Fay*, 16 Ill. Rep. 558, it is held that the highest degree of care, vigilance and skill are required, and that the carrier is responsible for the least neglect known to the law, short of insurance.   In *Frink* v. *Potter*, 17 Ill. 406, it was held that carriers of passengers are liable for slight neglect, and that the law imposes upon them the duty of carrying their passengers safely, so far as is reasonably practicable, and that they would be liable for injury by the breaking of an axle by reason of frost, if by extraordinary care and attention the danger might have been avoided.   Similar views are also maintained in *Frink* v. *Coe*, 4 Greene, Iowa Rep. 555, and in *Fairchild* v. *California Stage Co.*, 13 Cal. Rep. 599.

In *Kenney* v. *Neil*, 1 McLean 540, it was held that a passenger carrier was not liable for casualities which human sagacity could not foresee, and against which the utmost prudence cannot guard; that the driver is bound to exercise the utmost care and must be skilful, and that the employer is responsible for the least degree of imprudence and want of care in the driver; and much the same is *Marcy* v. *Tallmage*, 2 McLean 157, holding that the carrier is bound to carry his passengers safely as far as human skill can accomplish that object, and is chargeable for the least negligence or want of skill or prudence.

In our own State it is said, per Eastman, J., that railroads as carriers of passengers are liable for all damages that may arise to them from even the smallest negligence on their part, or that of their servants. *Cornwall* v. *The Sullivan R. R.*, 28 N. H. 169.   A similar statement is made in *Clark* v. *Barrington*, 41 N. H. 51.

The authorities cited fully sustain the general view taken by the judge in his instructions to the jury, and the question is whether in the illustrations given there was any thing calculated to mislead them.   The objection most urged is the statement that defendants must use such a degree of care as is practicable, short of incurring an expense which would render it altogether impossible to continue the business.

This is substantially the language of Judge Redfield in 2 Railways, 3d ed. page 187, and is apparently based upon the idea that the rule calling for the utmost degree of care, vigilance and precaution must be understood not to require such a degree of vigilance as will be wholly inconsistent with the mode of conveyance adopted, and render it impracticable.   This is the doctrine of *Tuller* v. *Talbot*, 23 Ill. 357, where it is also said that this rule does not require the utmost degree of care which the human mind is capable of inventing, as such a rule would involve the expenditure of money, and the employment of hands so as to render it perfectly safe, and would prevent all persons of ordinary prudence from engaging in that kind of business.   But the rule *does* require that the highest degree of practicable care and diligence should be used that is consistent with the mode of transportation adopted.

To the general views thus expressed we perceive no objection.   Indeed, it is quite manifest, we think, that in fixing upon a measure of the obligation of common carriers by railway to the travelling public, it is proper to consider how far it is reasonably practicable for them to go in view of the expenditures that might be required; and, looking at the subject

as a whole, we think it could never have been intended to fix upon a measure of care that would render it practically impossible to continue this mode of transportation.

At the same time the standard of care and diligence for a particular railroad cannot be made to depend upon its pecuniary condition, or the amount of its earnings; but having undertaken to carry passengers· in that mode, its duty is to provide a track, rolling stock and all other agencies suited to the nature and extent of the business it proposes to do; and the measure of its care and diligence is not to fluctuate with the changes in its revenues. A direction to the jury, therefore, that should make the degree of care required turn upon the pecuniary means of this particular road would be erroneous.

The part of the charge particularly objected to is the direction that "defendants must use such degree of care as is practicable, short of incurring an expense which would render it altogether impossible to continue the business."

This might, and probably would, be understood to require of the defendants all practicable care to the extent of their means, which would make the ability of the corporation the measure of the care and diligence required, and *that* obviously is not the true test—and judging from other parts of the instructions it was not so intended—still the terms used are so explicit that there is reason to fear that the jury may have been misled and induced to require as a standard a higher degree of care and diligence than the law ·actually demands. It would be quite likely to be so, if it appeared that the corporation was receiving a large income from this business beyond the expenses. If, on the other hand, it appeared that the receipts did not equal the running expenses, the jury might feel at liberty to exact a lower degree of care and diligence.

In respect to common highways it has been decided in this State that the standard by which their sufficiency is to be tested is not to be expanded or contracted by the wealth or poverty of the town. *Winship* v. *Enfield*, 42 N. H. 197, 208, and we think the same rule is applicable to the proprietors of railroads. They are bound to keep them in suitable repair, and to operate them with suitable care and diligence, considering the character and extent of the use to which they are applied.

As before remarked, the passage under consideration is in terms much like the passage in 2 Redfield on Rail., 187; but upon a close examination of his statement it will not be found that the author intended to announce the doctrine that the degree of diligence was to be measured by the revenues of the particular railroad, but that in fixing a general standard of care and diligence there should not be so much required as to render this mode of conveyance impracticable.

The objection to the passage in question now before us, is the danger that the jury may have understood that the defendants were bound to use all practicable care and skill to the extent of their means; and as we do not know that their means were not understood to be ample, we cannot be sure that the jury were not misled.

The jury in this case have found that there was gross negligence, and

it might, perhaps, be urged that this finding shows that no harm was done by the instructions in question. We think, however, that in determining what was gross negligence, the jury would naturally and properly be influenced by the degree of care and diligence which they supposed the law required; and if that standard was carried too high they might also come to a wrong conclusion as to what was gross negligence. We, therefore, are constrained to hold that in respect to the particular direction under consideration, the charge was erroneous.

It is urged also that there was error in the direction that defendants were bound to the utmost care and prudence of a very cautious person; but we think there was no error in this. It is not only in accordance with the doctrine of the elementary books, but is sustained, as we have seen, by the general current of adjudged cases.

It is true that the terms used do not furnish an exact measure of the care required, but that difficulty is inherent in the nature of the subject. It has, however, this advantage that it conforms substantially to the ordinary definition of the highest degree of care required of bailees of goods, and has therefore the sanction of long use.

In respect to exemplary damages, we consider the law to be well settled in New Hampshire in accordance with the instructions given to the jury, namely, that if they found that the accident was caused by the gross negligence of the defendants, they might, if they chose, give exemplary damages.

The same question was fully considered in *Hopkins* v. *Atlantic & St. L. Railroad*, 36 N. H. 9, and the conclusion reached that exemplary damages might be awarded in a case like this. This decision was in 1857, and after a careful examination of the authorities on the point, we are fully satisfied with it.

In *Whipple* v. *Walpole*, 10 N. H. 130, the same question was considered, and the court held that if there was gross negligence the jury might award exemplary damages.

In *Knight* v. *Foster*, 39 N. H. 576, which was an action for slander, it was held that where actual malice is shown the jury may award exemplary damages, what the defendant ought to pay and the plaintiff ought to receive; and in *Symonds* v. *Carter*, 32 N. H. 466, it was held that in an action for slander, increased damages may be awarded for the increased malice and malignity of heart attending the uttering of the words; and this is a recognition of the doctrine that the jury are not confined to the idea of mere compensation for the injury, but may award damages by way of punishment and example.

In *Perkins* v. *Towle*, 43 N. H. 220, it was held that in trespass *quare clausum fregit*, exemplary damages may be recovered when there are such circumstances of aggravation, of insult, and of malice, as would warrant such recovery in other cases.

Upon this review of the adjudged cases in our own State, we might be amply justified in saying that the question was no longer an open one here; but as the point has been made at the bar, we have examined the decisions elsewhere and are satisfied that there is a great preponderance of authorities in favor of the doctrine adopted in this State.

This doctrine is denied by an eminent jurist, Professor Greenleaf, in his work on Evidence, vol. 2. sec. 203, in an elaborate note, in which he reviews the authorities, and urges with great force and ability that upon principle, damages should be a just compensation for the injury actually sustained, and neither more nor less; and that to allow a jury to award damages by way of example, and as a punishment for a wrong committed, beyond a just compensation for the injury done to the plaintiff, would be a departure from the true principles upon which damages are awarded, that is not countenanced by the authorities when fairly considered.

The position is that for the legal wrong done to the plaintiff the defendant is bound to make full compensation; but for the moral wrong, whether it rises to the character of an offence punishable by law or not, he is answerable to society alone; that it is especially unjust to allow the plaintiff to recover damages beyond a fair compensation for the injury by way of punishment for an offence for which the defendant is liable to be punished by a public prosecution, inasmuch as in that way he is liable to be punished twice for the same offence.

The views of Professor Greenleaf are also expressed in an article in the Law Reporter of April, 1847. There is also an able article on the same side in 3 Am. Jurist, 287, by Hon. Thomas Metcalf, which seems to have taken the lead in opposition to the doctrine in question. On the other hand the subject is very fully discussed and the authorities reviewed by Mr. Sedgwick in his work on Damages, 4th ed. chap. 18, page 454. In chapter 1, page 38, he lays it down that when fraud, malice, gross negligence or oppression mingles with the controversy, the law, instead of adhering to the system or the language of compensation, adopts a wholly different rule. It permits the jury to give what are called punitory, vindictive or exemplary damages; in other words blends together the interests of society and of the aggrieved individual, and gives damages not only to recompense the sufferer but to punish the offender. See also Mr. Sedgwick's article on the same subject in Law Reporter of June, 1847, in reply to Professor Greenleaf. The general doctrine of Mr. Sedgwick is supported by a great weight of authority. Chancellor Kent in 1 Com. 9th ed., 627, says that it appears to him that the conclusions in Mr. Sedgwick's treatise are well warranted by the decisions, and that the attempt to exclude all consideration of the malice and wickedness and wantonness of the tort, in estimating a proper compensation to the victim is impracticable, visionary, and repugnant to the just feelings of social sympathy.

Mr. Parsons, in his work on Contracts, 2d vol., page 449, expresses an opinion that the courts of this country generally permit a jury in certain cases to give damages which exceed the measure of legal compensation, and are justified by the principle that one found guilty of so great an offence should be made an example of in order to deter others from the like wrong doing.

In the United States courts the doctrine of Mr. Sedgwick is recognized. In *Day* v. *Wentworth*, 13 How. 363, Grier, J., in delivering the opinion of the court, said: "It is a well established principle of the

common law that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff. We are aware," he says, "that the propriety of this doctrine has been questioned by some writers; but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument." As suggested by Perley, C. J., in *Hopkins* v. *The At. & St. L. R. R.*, the allowance of exemplary damages at the suit of a private individual finds countenance in that legislative policy which by giving pecuniary penalties to private prosecutors of certain offences seeks to enlist their aid in enforcing many salutary penal statutes.

That doctrine which allows a jury to award exemplary damages to the sufferer by wrongful acts which the public is strongly interested to punish, stands upon the same footing, so far, at least, as the damages are merely punitory; and it is quite obvious, we think, that this furnishes the most efficient, if not the only, means of correcting many very serious social abuses; and among these, that gross negligence which puts at unnecessary hazard the life and limbs of large numbers of passengers must take a high rank. It is not, therefore, to be regretted that the law has established an exception to the ordinary rule in respect to damages, and armed the sufferer in such cases with the powers to administer a corrective which cannot or will not otherwise be efficiently applied at all.

The doctrine is not the result of direct legislation as is the case with *qui tam* actions, but we think it has become too firmly established to be shaken without legislative action.

It has been contended that however it may be in cases of fraud, malice and oppression, exemplary damages cannot be awarded for gross negligence merely. It will be observed, however, that it is otherwise settled in this State in the cases of *Whipple* v. *Walpole*, and *Hopkins* v. *Atlantic & St. L. R. R.*, before cited. It is also the doctrine of Sedgwick as before stated. In some cases it has been held that the negligence must be of such a character as to evince a wanton disregard of human life and safety, equivalent to malice, as in *Pickett* v. *Crook*, 20 Wis. 358; *Wardrole* v. *Cal. Stage Co.* 7 Cal. 118.

It has been held also that when the public wrong is punishable criminally, exemplary damages ought not to be awarded, upon the ground that if it were otherwise the wrong-doer would be twice punished for the same offence; and this is the doctrine in Massachusetts, *Austin* v. *Wilson*, 4 Cush. 273; and in Indiana, *Wassauren* v. *Rickert*, 18 Ind. 350; *Humphries* v. *Johnson*, 20 Ind. 190. On the other hand, it is held in New York in *Cook* v. *Ellis*, 6 Hill, 466, that in trespass for assault and battery the defendant shall not be permitted to prove in mitigation of damages that he has already been convicted and fined for the same offence, and has paid the fine, though it is supposed to be the correct practice to continue the criminal proceeding to await the decision of the civil suit, and then impose a fine in view of it,

which is said to be the English practice; to which authorities are cited. So in *Fry* v. *Bennett*, 4 Duer's Rep. 247, which was a suit for a libel in the *New York Herald*, it was held that plaintiff might recover exemplary damages, although defendant was liable to indictment; and such is the doctrine of *Cole* v. *Tucker*, 6 Texas 266. In *Corwin* v. *Walton*, 18 Mo. 71, it was held that exemplary damages might be recovered, although defendant had been convicted and fined for the same assault and battery, but that this fact might be considered in mitigation of damages, and also that the court in fixing the amount of the fine might properly consider a recovery in a civil suit. So in Ohio it is held that exemplary damages may be awarded, although defendant may have been prosecuted criminally. *Roberts* v. *Mason*, 10 Ohio, (N. S.) 277. See also Sedgwick on Dam. 4th ed. 535, and cases, where the weight of authority is supposed to be against such a limitation. It is not necessary, however, to determine this question as it does not arise on this case.

It is contended by the defendants that there was no evidence tending to prove gross negligence; there was evidence, however, tending to prove that the accident was caused by the breaking of a rail about two feet from the end where the track was very much curved and about fifteen or twenty feet from Amonoosuck riv and that two passenger cars were thrown part way down the bank; that the rail which broke was inside the curve; that it was an old rail and appeared very much worn and battered and broomed up from one to two feet from the end; that it was a U rail, the old style, and that the T rail is the new style; and that the train was going not over twenty miles the hour. It further appeared that the broken rail was not preserved or produced at the trial, although the defendants offered evidence to show that the breakage was caused by a hidden defect in the rail, which they were not in fault for not detecting.

We are of the opinion, upon the whole, that there was evidence to go to the jury upon the point of gross negligence. It tended to show that the accident was caused by a defective rail, and that this one, at a place somewhat dangerous, was old and very much worn and battered and broomed; and whether there was gross carelessness in permitting that rail to remain under the circumstances was peculiarly for the jury to decide. Upon this point, therefore, we think there was no error; but for error in the instructions there must be

*A new trial.*