HARDY *v.* MERRILL.

</div>

{ Dec. 14, 1875.

| 56 | 227 |
| 67 | 528 |
| 56 | 227 |
| 72 | 251 |
| 72 | 252 |

*Evidence— Opinions of non-professional witnesses—Insanity—Practice— Right to open and close.*

Non-professional witnesses, who are not subscribing witnesses to a will, may testify to their opinions in regard to the sanity of the testator, when founded upon their knowledge and observation of the testator's appearance and conduct. *Boardman* v. *Woodman,* 47 N. H. 120, *State* v. *Pike,* 49 N. H. 399, and *State* v. *Archer,* 54 N. H. 468, upon this point, overruled.

The party who affirms that a will was duly and legally executed, has the burden of proof and the accompanying duty of opening, and the right to close, no matter in what form the issues for trial may be drawn.

FROM MERRIMACK CIRCUIT COURT.

APPEAL, by William H. Hardy against Isaac D. Merrill, from the decree of the judge of probate approving and allowing, in solemn form,

---

*SMITH, J., did not sit.

the will of Joseph Hardy, deceased. Said will was dated July 26, 1870. Issues had been made up at the law term, and sent to the circuit court for trial by jury. The issues were in common form. In the first, the executor alleged that the said Joseph Hardy was of sound mind; and in the second, he alleged that said will was not obtained by undue influence: upon both of which allegations issue was taken by the appellant.

In the circuit court the cause had been sent to referees, who, after hearing, found both issues in favor of the executor, and made an additional report raising certain questions of law, which are as follows:

At the hearing, and before the same commenced before the referees, the appellant claimed the right to open and close. The referees ruled otherwise, and he excepted.

C. G. McAlpine, a witness for the appellant, testified as follows: " He (the testator) seemed to be all broken down [in mind and] in body." Words in brackets excluded, and appellant excepted. The same witness also testified that he tried to buy some bank stock of him (the testator) after his wife died. From that time to June, 1870, when I carried him, he had changed very much. [When I tried to buy his bank stock, I could see he was failing.] Words in brackets excluded, and the appellant excepted; but he was allowed to make the following statements, subject to the exception of the appellee: " His mind was such that he could not give any intelligent answer;" also, " At the time I carried him in 1870, he did not seem to have any memory;" also, " At the time I tried to buy his bank stock, I discovered that he had failed;" also, " His conversation was childish."

The same witness was asked, " How did his conversation, as to coherency and correctness, in June, 1870, compare with it at the time you tried to buy his bank stock?" which question was ruled out, and the appellant excepted.

Solomon Hardy, a brother of the testator, was called as a witness by the appellant, and the following questions, among others, were put to him:

1. " Being a brother of Joseph Hardy, from your observation of his appearance and conduct at the time you saw him at your house in June, 1869, state whether or not, in your opinion, he was, at the time, of sound and disposing mind and memory."

2. " Being a brother of the testator, from what you had observed as to his conversation, conduct, and general deportment as to all subjects, up to July 26, 1870, have you any opinion as to his sanity at that date, and, if so, what is it?" The referees excluded these questions, and the appellant excepted.

Josiah C. Hardy, a witness for the appellant, testified, among other things, that the " testator appeared like a failing man in every respect," which was excluded, and the appellant excepted.

Madison M. Howe, a witness for the appellant, testified that the testator " appeared like a man who did not seem to know what he was talking about half the time," which was excluded, and the appellant

excepted; but he was allowed to state, subject to the exceptions of the appellee, that " he (the testator) appeared very weak in his mind."

George B. Hardy, a witness for the appellant, stated, subject to exception of the appellee, that " he (the testator) appeared childlike— appeared feeble in body and mind—more like a child than a rational man."

Samuel C. Hardy, a witness for the appellant, testified that " it looked to me as though he was failing in his business capacity, or in his mind," which was excluded, and appellant excepted.

Lyman D. Stevens, a witness for the appellee, testified that he wrote the will in question for Joseph Hardy, at the office of the witness, and stated what said Hardy said and did on that occasion, which was some three weeks before said will was executed. He was asked the following question : " If there was anything in the conversation or conduct of Joseph Hardy, in your office, that indicated any impairment of any of his mental faculties, please state the same fully, without giving any opinion." *Ans.* " I observed nothing whatever." To this question and answer the appellant excepted.

In the circuit court, at the April term, 1875, it was ordered that the questions of law raised by the report of the referees be reserved and transferred to this court for determination.

*Mugridge,* for the appellant.

We submit that the question put to Solomon Hardy, the brother of the testator, whether he had any opinion as to the sanity of the testator when the will was made, and if so, what it was, was improperly excluded by the court.

We know that this suggestion is in conflict with certain decisions, referred to by the other side, in which this kind of testimony has been rejected ; but feeling, as we do, that the existing rule on this subject is clearly wrong, we most respectfully ask the court to reconsider it, in the hope that, its fallacies appearing, it may be condemned as tending to subvert rather than promote the ends of justice, and as being no longer worthy of toleration.

The first time that the precise question now under consideration was before the court in this state was in *Boardman* v. *Woodman,* 47 N. H. 120, and the decision was then made by a divided court. The opinion of the majority of the judges in that case seems to be based on the general doctrine, recognized in some of the prior cases referred to by counsel on the other side, that ordinarily the opinions of witnesses other than experts are not admissible.

To show, however, that this rule, broadly stated as above, admits of a large class of exceptions, and was not intended by the court to be strictly applied, we cite the following cases, in which the opinions and judgments of witnesses are held to be competent under various circumstances: *State* v. *Shinborn,* 46 N. H. 501 ; *Whittier* v. *Franklin,* 46 N. H. 25 ; *Taylor* v. *Railway,* 48 N. H. 309 ; *Eastman* v. *Company,* 44 N.

H. 155; *Hackett* v. *Railroad*, 35 N. H. 399; *Spear* v. *Richardson*, 34 N. H. 428; *Hall* v. *Davis*, 36 N. H. 571; *Patterson* v. *Colebrook*, 29 N. H. 101; *Beard* v. *Kirk*, 11 N. H. 401; *Whipple* v. *Walpole*, 10 N. H. 130; *Willis* v. *Quimby*, 31 N. H. 489; *Wheeler* v. *Blandin*, 22 N. H. 170.

We wish to refer the court, also, to the learned and exhaustive dissenting opinions of Judge Doe, in *State* v. *Pike* and *Boardman* v. *Woodman*, as indicating what we claim to be the true rule of evidence, and the one abundantly supported by the weight of judicial authority.

We would suggest, that no more odious law of practice exists than the one under consideration, and that its rigid enforcement is one of the greatest embarrassments and hindrances in the administration of justice that can be found in the practice of this state.

To render evidence as to mental condition competent, it must be purely and essentially descriptive in its character; and any statement partaking at all of the nature of an opinion is at once rejected. By witnesses who are not capable readily of making that accurate discrimination required to keep opinion and fact, oftentimes so intimately blended, separate in testifying, the rule is most difficult of comprehension, and much testimony is many times excluded on account of the inability of the witness to make the true distinction demanded.

To illustrate: Mr. McAlpine, in testifying, is not allowed to say that the testator " seemed to be all broken down in mind and body," because he was giving an opinion, and this testimony was excluded on that account; he was, however, permitted to say that " his conversation was childish," because that is held not an opinion, but mere description of his condition. He could not say that when he tried to buy his bank stock he " could see he was failing," but might say that at that time he " discovered that he had failed." One witness, Mr. McAlpine, was allowed to testify that he discovered at one time that the testator " had failed;" but the evidence of Josiah C. Hardy, that the " testator appeared like a failing man in every respect," was excluded as incompetent. Mr. Howe, another witness, could not state that the testator " appeared like a man who did not seem to know what he was talking about half the time," but was allowed to say that " he appeared very weak in his mind." To call upon ordinary witnesses to exercise that nicety of discrimination and refinement of learning necessary to make those bewildering distinctions required by the law, as appear by the above rulings made in the trial of this case, as the printed case shows, is simply ridiculous; it not only tends greatly to disconcert and hinder the witness in giving his evidence, but it makes the trial of any cause, governed by such a rule, a mere travesty upon the administration of justice, in the estimation of all sensible persons.

Again: we suggest that a class of evidence, which would with every intelligent jury be the most satisfactory, is now peremptorily excluded. A parent, brother, or friend, who may have associated with the testator on terms of the closest intimacy every day of his life, and

become, by the closest observation and study, perfectly familiar with every phase of his character, no matter how great his learning and intelligence on other subjects, unless he has made mental diseases a study, so that he can be recognized as an expert in such matters, is debarred from expressing his opinion, while that of the expert, who never saw the party, and had no actual knowledge of him, upon a hypothetical case is admitted. Is it not a matter of familiar experience, that many persons who are not professional experts, from their means of knowledge are capable of giving opinions on this question of mental derangement that would be intelligent and perfectly reliable, and of tenfold more importance than that of any expert?

We say that the policy and rules of law would be the wisest and best which would admit evidence of the kind indicated to be placed before the jury, leaving its weight and importance to be determined by the test of cross-examination.

Believing, as we do, that the view of this question so ably presented by Judge DOE in the dissenting opinions to which we have referred, and upon which we rely in this case, is much the fairer and better one, and that it is more in accordance with the practice in almost every state in the Union, as is abundantly shown by the authorities he has cited, we sincerely hope it may be adopted here, and that the existing rule may be rejected as being against reason and the weight of judicial authority.

II. If the old rule is to be adhered to, then we suggest that the testimony of the different witnesses of the appellant, referred to in the case as being excluded because in the nature of opinions, should have been received. Mr. McAlpine said that the testator seemed " all broken down in mind," and that he " could see that he was failing ;" Mr. Josiah C. Hardy testified that he " appeared like a failing man in every respect ;" and Mr. Howe, that he " appeared like a man who did not seem to know what he was talking about half the time." This testimony was excluded, and we say improperly ; for we contend that it is not the opinion of the witnesses that is presented thereby, but that the evidence is purely descriptive of the old man's condition.

To say that a person appeared to be " failing," or like a " failing man in every respect," etc., is no more an opinion, than to say that a horse did not " appear frightened, but sulky," which was held competent in *Whittier* v. *Franklin*, before cited; or that he " appeared well and free from disease," held to be competent in *Spear* v. *Richardson*, 34 N. H. 428 ; or that a horse's " feet were diseased," which was admitted in *Willis* v. *Quimby*, 31 N. H. 489. We say, this testimony should have been admitted upon the grounds stated in above decisions.

III. As to the right of the appellant to open and close, we rely upon the logic and law of Judge DOE, in *Boardman* v. *Woodman.*

*Sargent & Chase*, for the executor.

1. The appellee had the right to open and close. The party who affirms that a will was made has the primary burden of proof, and the

accompanying right to close, and it matters not which party is the appellant. *Buckminster* v. *Perry*, 4 Mass. 593 ; *Brooks* v. *Barrett*, 7 Pick. 94 ; *Goss* v. *Turner*, 21 Vt. 440 ; *Robinson* v. *Hitchcock*, 8 Met. 64 ; *Veiths* v. *Hogge*, 8 Clarke (Iowa) 163 ; *Perkins* v. *Perkins*, 39 N. H. 163, and cases ; *Judge of Probate* v. *Stone*, 44 N. H. 593 ; *Boardman* v. *Woodman*, 47 N. H. 120. The form of the pleas in this case is such, that on the first plea the plaintiff had the primary burden of proof, to show that the testator was sane at the time of making the will ; and that is a requirement which the statute prescribes and which must he shown affirmatively.

2. The questions to Solomon Hardy were not competent, he not being a subscribing witness to the will, nor an expert. The general rule, that the opinions of witnesses not experts are not competent evidence, is well established and everywhere admitted. The subscribing witnesses to a will are an exception to this rule, well marked and defined. The statute has made another exception as to the value of property—Gen. Stats., ch. 209, sec. 24. There is no good reason why insanity should be treated as an exception to this general rule, and if any change were to be made, it would be better now for the legislature to make it, as they did in relation to the proof of the value of property. But the fact that the legislature has not changed, or undertaken to change, the rule which has been so long established and so uniformly applied in regard to insanity in this state, is the best evidence that the people of the state do not desire any change in that particular. *Hamblett* v. *Hamblett*, 6 N. H. 333 ; *Patterson* v. *Colebrook*, 29 N. H. 96 ; *Concord Railroad* v. *Greeley*, 23 N. H. 237 ; *Kingsbury* v. *Moses*, 45 N. H. 225 ; *Lowe* v. *Railroad*, 45 N. H. 370; *Boardman* v. *Woodman*, 47 N. H. 120, 133 ; *State* v. *Pike*, 49 N. H. 399 ; *State* v. *Archer*, 54 N. H. 468. The decisions in Massachusetts on this point have been uniformly in the same direction as our own—*Poole* v. *Richardson*, 3 Mass. 330, *Needham* v. *Ide*, 5 Pick. 510, *Com.* v. *Wilson*, 1 Gray 337, *Baxter* v. *Abbott*, 7 Gray 71, *Com.* v. *Rich*, 14 Gray 335, *Com.* v. *Fairbanks*, 2 Allen 511 ; and the people of that state have never seen fit to change the rule, though it has always prevailed there : the legislature has never seen cause to make such opinions competent evidence in that state.

*Foster C. J., C. C. I. At the hearing before the referees, the appellant claimed the right to open and close.

In *Judge of Probate* v. *Stone*, 44 N. H. 593, it was held that the party on whom the burden of proof in the first instance devolved, was entitled to open and close ; that to determine which party is to begin, and, of course, which shall close, is to consider which would get the verdict, if no evidence was given on either side ; and the right to begin is with the one who in that way would lose his case.

In this case issues were joined by the appellant upon averments of

---

* Smith, J., having presided at the trial before the referees, did not sit.

the executor,—(1) that the testator was of sound mind, and (2) that the will was not obtained by undue influence. As these issues are made up, the burden of proof would seem to be on the executor, and not on the appellant: and in *Judge of Probate* v. *Stone*, at page 605, it is said,—"The party who affirms that a will was made, has the primary burden of proof and the accompanying right to close."

In *Boardman* v. *Woodman*, 47 N. H. 120, 132, it is said,—"Whatever form the issues which are sent to the trial term may assume in such cases, the nature of the proceeding is never lost sight of, nor is the final object to be attained to be kept from view. * * * The question to be determined, no matter in what form the issues may be drawn, is the due and legal execution of the will."

In *Perkins* v. *Perkins*, 39 N. H. 163, 167, Bell, C. J., says,—"The object of the proceeding is to prove the due execution of a written instrument. * * * The instrument itself must be produced, unless in a few excepted cases where secondary evidence is admitted; and the attesting witnesses must be produced and examined, if they are living and within reach of the process of the court. They are to be produced by the party who offers the instrument, or who seeks a decree that it has been proved. * * * The usual formal proof being offered, the law comes in with its presumption that the party is sane, and this presumption stands until evidence is offered tending to raise a different belief. * * *

"Though ordinarily no question need be asked of the witness, who testifies to the execution of an instrument, relative to the capacity of a grantor, yet, owing to the nature of the proceedings in the case of wills, that the probate of the will is the foundation of the grant of power to the executor to take possession of the estate and the charge of administ- 'on, it is, in that case, the long-settled practice of courts of probate to require that the witnesses to wills should be examined as to the fact of the sanity of the testator before the will is established. * * * This practice is equally binding, as the law in such cases, upon the supreme court, as on the ordinary courts of probate. * * * It is, therefore, proper to say that the burden of proving the sanity of the testator, and all the other requirements of the law to make a valid will, is upon the party who asserts its validity. This burden remains upon him till the close of the trial, though he need introduce no proof upon this point until something appears to the contrary." To the same effect see *Tingley* v. *Cowgill*, 48 Mo. 291, and *Renn* v. *Samos*, 33 Tex. 760. On the other hand, it may be said, the decree of the judge of probate establishing the will was not vacated by the appeal. Gen. Stats., ch. 188, sec. 12.

The due execution of the will is not in controversy, and it is not necessary for the appellee to prove it. The appellant must set forth in writing the reasons of his appeal; and in this court he is restricted to such points as are therein specified. Gen. Stats., ch. 188, sec. 2; *Patrick* v. *Cowles*, 45 N. H. 553; *Boardman* v. *Woodman*, 47 N. H. 140.

The executor has formally tendered an issue upon the sanity of his testator, and the appellant has joined that issue; but the executor's allegation of sanity is supported, without evidence, by a presumption of law, as is said by Judge BELL in *Perkins* v. *Perkins*, and he is entitled to a verdict unless the appellant assumes and discharges the burden of proof, which requires him to maintain and prove the insanity of the testator. See *Thurston* v. *Kennett*, 22 N. H. 151; *Bills* v. *Vose*, 27 N. H. 215, and cases there cited; *Boardman* v. *Woodman*, 47 N. H. 140–144; *Hall* v. *Unger*, 2 Abb. U. S. 507.

In Massachusetts the statute requires the person offering a will for probate to prove the sanity of the testator—*Boardman* v. *Woodman*, page 125; but we have no such statutory provision.

In *Commonwealth* v. *Haskell*, 2 Brews. (Pa.) 491, it is held that on the hearing of a commission of lunacy, the burden of proof is upon the commonwealth, the presumption being in favor of sanity, and, therefore, that the relator has the right to open and close.

Probably the determination of this question is a matter of no practical consequence in the present case. The right, as it is called, to open and close, may be a matter within the discretion of the court, the granting or refusing of which is not in general a ground for a new trial or bill of exceptions. There are many authorities which hold that a verdict will not be disturbed on the ground that the wrong party was permitted to open or to close, unless it be made to appear that injustice has been done. *Boardman* v. *Woodman*, at page 143; Hilliard on New Trials 298.

I think the court would hardly be justified in entertaining a discretion which should operate in conflict with the general rule and practice in matters of this kind.

It is not without some hesitation, nor without respect for the adverse doctrine, that I concur in the opinion of the majority of the court that the ruling of the referees, in denying to the appellant the right or privilege of opening and closing upon the trial, was correct.

II. The case before us involves an inquiry into the nature and extent of the exceptions to the general rule, that testimony of facts alone is admissible in courts of justice, and that the opinions of witnesses are to be excluded.

The same questions are presented which were considered by the late supreme court in *Boardman* v. *Woodman*, 47 N. H. 120, and *State* v. *Pike*, 49 N. H. 399. In both these cases a majority of the court sustained the doctrine of the exclusion of the opinions of non-professional witnesses upon questions of mental condition.

I am unable to speak from personal knowledge (because I was not then a member of the court) of the extent and amount of consideration bestowed upon the subject in the two cases referred to. It will, however, be obvious to the reader of the reports, that in *Boardman* v. *Woodman* the majority of the court were content, without renewed investigation, to adhere to the rule, which they understood to be " in

accordance with the long established and uniform usage in this state;" while in *State* v. *Pike*, SMITH, J. (not intimating his own views), disposes of the whole question with little more than the remark,—" A majority of the court are not disposed to overrule the very recent decision in *Boardman* v. *Woodman*, that witnesses who are not experts cannot give their opinions on the question of sanity." In *State* v. *Archer*, 54 N. H. 468, the court were not " prepared to overrule these decisions," nor were they prepared to investigate the matter. In view of all the other circumstances, and the established conditions of the case, this question was of slight consequence.

But the subject is so rapidly increasing in importance, that its thorough reëxamination ought to be no longer postponed.

It is fair to presume that the majority of the court were satisfied, upon principle, with the reasons which had been expressed, or, rather, the conclusions attained in the courts of three states of the Union, where the same doctrine had been established; and, perhaps, the most elaborate investigation might not have affected their minds in such a way as to produce a different result; nevertheless, one fact cannot be ignored, namely, that a careful examination into the history of this branch of the law, as administered in our own state, would have compelled the suppression of the remark that the rule excluding such opinions was " in accordance with the long established and uniform usage in in this state," the truth being, that the usage and practice, if uniform, have been in the opposite direction, and that the rule, as declared by the supreme court in 1866 and 1869, is a departure from the " usage and uniform practice " in the courts of this state during a period of time when the bench was adorned by " sages of the law " whose learning and ability have commanded universal respect and admiration.

That the subject was not carefully considered in *Boardman* v. *Woodman*, but was passed over as a matter " well established," is manifest from the fact (which would otherwise be quite remarkable) that the corner-stone upon which the " long established " doctrine and usage in this state is said to rest, is the case of *Hamblett* v. *Hamblett*, 6 N. H. 333 (A. D. 1833). Now it is quite clear that no such established rule is there laid down. On the contrary, Judge PARKER, fresh from the trial of Daniel H. Corey, was not prepared to stultify himself by promulgating doctrines upon the bench directly opposite to those which he had successfully maintained at the bar.

Accordingly, he declares that, " on the supposition that this testimony of Mary Palmer to matter of opinion, or, rather, to matter from which her opinion of sanity was to be inferred, was incompetent—*which is not conceded* if sufficiently connected with facts—the question arises whether this furnishes any ground for a new trial, the court having thus directed the jury;" but, " as to the direction of the judge relative to evidence of opinion, it may be proper to remark that we do not intend to be understood as establishing this as the rule. The weight of authority seems to be in favor of admitting the opinions of others than the witnesses to the will, if connected with evidence of the facts upon which those

opinions are founded"—citing 3 Stark. Ev. 1707, in notes, *Grante* v. *Thompson*, 4 Conn. 203, *Hathorn* v. *King*, 8 Mass. 371, *Buckminster* v. *Perry*, 4 Mass. 594, and *Lowe* v. *Jolliffe*, 2 Wm. Black. 365. He continues,—" It remains to be considered, whenever the question shall directly arise, whether this is not the most eligible and proper course in questions of this nature ; but upon this matter it is not now necessary to make a decision."

The only other New Hampshire case referred to by the court, in support of the decision in *Boardman* v. *Woodman*, was *Low* v. *The Railroad*, 45 N. H. 370, where it was held that the opinion of a witness as to the value of a horse was inadmissible, although the same witness was allowed to express his opinion as to the size, weight, and speed of the same animal, these latter opinions being " received of necessity." That " necessity " being supplied, it was said, by the court,—" That there can be no necessity for receiving such opinions [of value] is obvious from the fact that all the materials for forming an opinion for themselves would be laid before the jury, whether the opinions of witnesses were to be received or not ; and, judging from ordinary experience, the mere opinion of the witnesses would afford to the jury but little aid."

Perhaps this may be true (though I am not prepared to concede it) with regard to a horse, with which animal most jurors have some acquaintance ; but I apprehend we should not have heard Judge BELLOWS using the same language with regard to a question of human sanity. On the contrary (from what we shall see, by and by, he has said), I infer that, if he had desired to be extremely cautious, he might have remarked,—" There could be no necessity for receiving such opinions, if all the materials for forming an opinion for themselves could be laid before the jury ; but, judging from ordinary experience, they cannot. Hence the necessity for admitting the evidence of opinion as being the best evidence of which the case is susceptible."

But to recur to the " long and well established usage in this state." *Hamblett* v. *Hamblett* was decided in 1833. We have seen that it does not sustain the position in aid of which it was invoked, but that the judgment of the court contains a very strong intimation that the doctrine of the admissibility of the opinions of non-professional witnesses upon a question of sanity had not been, and was not then likely to be, denied.

What was the anterior doctrine and usage which *Hamblett* v. *Hamblett* did not overthrow ?

*State* v. *Ryan* was tried in Cheshire county, May, 1811, before LIVERMORE, C. J., and STEELE, J. ;—the attorney-general, for the state ; Chamberlain, Hubbard, and Vose, for the defendant.

One non-expert testified that he " had no idea, from what he saw of the defendant, that he was any way deranged ;" another, that he " appeared like a man without sense ;" another, that, on a certain morning, he was " perfectly rational ; in the afternoon he became wild."

Judge LIVERMORE, in summing up the testimony, particularly named

the witnesses who, to use his own words, "testify that in their opinion he had not the use of his reason." See *State* v. *Pike*, 49 N. H. 417.

I have before me the pamphlet report of the trial of *Daniel D. Farmer*, before RICHARDSON, C. J., WOODBURY and GREEN, JJ., in 1821;—Geo. Sullivan, attorney-general, for the state; Richard Fletcher and Parker Noyes, for the defendant.

The dying declarations of the woman who was slain being material, the inquiries were made by the solicitor, "Had she her senses?" "Did she understand you?" The witness was unable to state. The court asked the witness, "Was the deceased sensible of what you told her?" Hon. Richard H. Ayer testified that the prisoner's *temper* was "mild and calm."

In 1825, Amos Furnal was tried at Dover for the murder of his child by starvation. RICHARDSON, C. J., presided. The solicitor, Lyman B. Walker, was assisted by Levi Woodbury, in the absence of the attorney-general. The prisoner's counsel were Jeremiah Mason and Stephen C. Lyford. Non-professional witnesses testified, without objection,—some, that the child " did not appear to be well dealt by;" others, that he " did not seem to be scanted;"—one, that he was a bright, sprightly lad; another, that " he was not so bright as the other children—did not talk bright and sensible."

*State* v. *Corey* was tried in Keene, A. D. 1830, before RICHARDSON, C. J., and GREEN and HARRIS, JJ.;—Handerson, Wilson, and Chamberlain, for the state; Woodbury, Hubbard, and Joel Parker, for the prisoner.

The report of the trial, which I have before me, and from which I make a few extracts, is published " by Joel Parker." Against the solicitor's objection, and after argument and the citation of a Massachusetts case, the court permitted the defendant's brother to testify: " His father is crazy;" his sister " is wild as a hawk;"—and six other non-professionals gave their opinion as to the prisoner's own mental condition, various witnesses for the state expressing adverse opinions. One witness testified that the defendant " looked and acted like a crazy person;" and another replied affirmatively to an inquiry by the court whether the defendant, on a certain occasion, "appeared rational." Judge RICHARDSON, summing up, told the jury that " the opinions formed the day before the homicide, by persons in a situation which enabled them to judge," were " entitled to great weight."

Such was the ignominious failure of the first attempt to introduce into this state the Massachusetts exception to a rule then entirely universal.

Then came on, in December of the same year, the case of *Hamblett* v. *Hamblett*, of which enough has been said.

In 1834, Abraham Prescott was tried in Merrimack county for murder, before RICHARDSON, C. J., and PARKER, J.;—Geo. Sullivan, attorney-general, for the state; Ichabod Bartlett, of counsel for the prisoner. It is safe to say that no accusation of a capital crime was ever more zealously and strenuously contested in this state by the distinguished

lawyers who managed the defence ; while the eminent attorney-general omitted no part of his own duty.

I discover that no fewer than seventeen non-experts gave their opinions concerning the prisoner's mental condition, one testifying that the prisoner's father " was crazy at times ; " his nephew " was crazy a number of times, to my knowledge ; " a cousin of the defendant " is not in his right mind, but not so crazy as his father : the more cider he got, the more crazy he grew."

Mrs. Poor testified : Moses was " not half so insane as his father."

Mrs. Huntoon swore that Mrs. Blake was " occasionally a little out." " She appeared so different while I was there from what she formerly was, that I thought she was crazy."

Mrs. Rowe had seen Marston Prescott " often when he appeared crazy."

Chase Prescott (the prisoner's father) swore : " My father was occasionally deranged ; " Marston was " crazy a number of years ; " Benjamin " was crazy."

On the other hand, Benning W. Sanborn saw Mrs. Blake frequently, " but never considered her crazy." Hall Burgin " never saw anything like derangement in the boy "—the prisoner.

John Johnson " never discovered any symptoms of derangement," and many other witnesses never saw any exhibition of " symptoms of insanity," and always considered the prisoner " a person of sound mind."

Mr. Bartlett, commenting upon the value of the opinions concerning the insanity of his client's aunt, said to the jury,—" They state facts in relation to her conduct and deportment, their own conclusions at the time, and the judgment and opinions of others, to whom the facts were known : they were inmates of the family—residents in her house. The insanity of his half-sister we prove by the testimony of his parents," &c. And Judge RICHARDSON, in summing up, commented minutely upon this evidence, and the weight and importance to be given it.

It would be merely a repetition of the historical part of Judge DOE's opinion, in *State* v. *Pike,* 49 N. H. 421–423, if I were to relate how, after the eminent jurists, who presided in our courts between the years 1811 and 1833, had all passed off the stage, the " Massachusetts exception " gradually worked into favor in New Hampshire, it having been erroneously declared by the Massachusetts courts to be an expression of the English common law. It was a " silent, unauthentic growth," germinating in times so recent as when no judge remained upon the bench who had participated in the decision of *Hamblett* v. *Hamblett,* or in the trial of the early cases ; and the contiguity of Massachusetts, and the resort by lawyers and judges to her reports more than to any other printed decisions, no doubt had much to do with importing into our tribunals a rule and doctrine which was, undoubtedly, well established there.

It is proper for me to invite attention to the history of what I have called the Massachusetts exception. Beginning with *Poole* v. *Richard-*

*son*, 3 Mass. 330 (A. D. 1807), we find no very wide departure from the general rule of admissibility. The case holds that non-professional witnesses may " not testify merely their opinion or judgment." Judge DOE (*State* v. *Pike*, page 410) suspects that " the only point ruled in this case was, that the witnesses were allowed to give their opinions when they stated particular facts from which the state of the testator's mind was inferred by them."

But the exception grew and dilated, finding larger and stronger expression along through the years and the course of the cases of *Hathorn* v. *King*, 8 Mass. 371, *Dickinson* v. *Barber*, 9 Mass. 225, *Needham* v. *Ide*, 5 Pick. 510, *Com.* v. *Wilson*, 1 Gray 337, down to *Com.* v. *Fairbanks*, 2 Allen 511 (A. D. 1861), when it was held *per curiam*, " that the incompetency of the opinions of non-experts was not an open question in Massachusetts;" though Judge THOMAS had recently said, in *Baxter* v. *Abbott*, 7 Gray 79, that " if it were a new question [he] should be disposed to allow every witness to give his opinion, subject to cross-examination upon the reasons upon which it is based, his degree of intelligence, and his means of observation."

In very recent times, however, we observe a more liberal disposition on the part of the Massachusetts courts—see *Barker* v. *Comins*, 110 Mass. 477 (A. D. 1872), and *Nash* v. *Hunt*, 116 Mass. 237 (A. D. 1874). In the former of these cases, it was held that persons acquainted with the testator, although neither witnesses to the will nor medical experts, may testify whether they noticed any change in his intelligence, and any want of coherence in his remarks. GRAY, J., said,—" The question did not call for the expression of an opinion upon the question whether the testator was of sound or unsound mind, which the witnesses, not being either physicians or attesting witnesses, would not be competent to give. The question whether there was an apparent change in a man's intelligence or understanding, or a want of coherence in his remarks, is a matter not of opinion but of fact, as to which any witness may testify, in order to put before the court or jury the acts and conduct from which the degree of his mental capacity may be inferred."

In *Nash* v. *Hunt*, a witness was allowed to say he observed no incoherence of thought in the testator, nor anything unusual or singular in respect to his mental condition, Judge WELLS saying,—"We do not understand this to be giving an opinion as to the condition of the mind itself, but only of its manifestations in conversation with the witness." The witness could state, " as matter of observation, whether his conversation and demeanor were in the usual and natural manner of the testator or otherwise;" and in *Commonwealth* v. *Pomeroy*, 117 Mass. 149, non-professional witnesses were allowed to state, without objection, that the prisoner, " in conversation and manner, evinced no remorse or sense of guilt."

With deference and great respect I may be allowed to say, that I rejoice much more in the results attained in these later cases than in the *modus operandi* of judicial reasoning by which the conclusions were

reached. They indicate decided and accelerating progress of the Massachusetts courts in the right direction. The full establishment of the true doctrine there, is a question of time only.

A tolerably careful investigation authorizes me to repeat the language of Judge DOE, that "in England no express decision of the point can be found, for the reason that such evidence has always been admitted without objection. It has been universally regarded as so clearly competent, that it seems no English lawyer has ever presented to any court any objection, question, or doubt in regard to it." *State* v. *Pike*, 49 N. H. 408, 409.

I presume, however, it will not be denied that in the ecclesiastical courts, where questions of testamentary capacity are generally tried, such opinions have always been received. See 1 Gr. Ev. (12th ed.), sec. 440, *n.* 4, *Dow* v. *Clark*, 3 Addams 79, *Wheeler* v. *Alderson*, 3 Hagg. 574, where Sir JOHN NICHOLL said, in pronouncing his judgment,—"There is a cloud of witnesses who gave unhesitating opinions that the deceased was mad."

The practice in the courts of the common law has been universal and unwavering in the same direction ; and "the number of English authorities is limited only by the number of fully reported cases in which the question of sanity has been raised." *State* v. *Pike*, 49 N. H. 409.

In the year 1800, James Hadfield was tried for shooting at King George III. The defence was insanity, and the opinions of non-expert witnesses were freely admitted—27 State Trials 1281, *et seq.*—and Mr. ERSKINE told the jury they "ought not to be shaken in giving full credit to the evidence of those who * * * describe him as discovering no symptoms whatever of mental incapacity or disorder." Erskine's Speeches (3d London ed.) 132, 140.

In *Egleton* v. *Kingston*, 8 Ves., Jr., 450, Ann Boak and Elizabeth Banson "expressed a strong opinion of the total incapacity of the deceased, both from his great imbecility of mind and the dominion * * of Mrs. Kingston ;" and John Fogg testified that "his faculties were very much impaired."

In *Lowe* v. *Jolliffe*, 1 W. Black. 365, the subscribing witnesses to a will having sworn that the testator was utterly incapable of making such an instrument—to encounter this evidence the plaintiff's counsel examined the friends of the testator, who strongly deposed to his sanity.

In *Tatham* v. *Wright*, 2 Russ. & Mylne, Lord Ch. Jus. TINDAL, " in behalf of himself and the Lord Chief Baron," in reading the judgment of the court, commented upon the fact that "on the trial of this cause, for the purpose of proving affirmatively the general incapacity of Mr. Marsden, a very large body of parol evidence was produced by the defendants in the issue, comprising not fewer than sixty-one witnesses in number, some of whom deposed to the state of Mr. Marsden's intellect and the powers of his mind in very early life, and others continued the account down to a period very shortly before his death in 1826.

The greater part of this testimony came from non-professionals, and consisted in the expression of opinion.

Courts and text-writers all agree that, upon questions of science and skill, opinions may be received from persons specially instructed by study and experience in the particular art or mystery to which the investigation relates.

But without reference to any recognized rule or principle, all concede the admissibility of the opinions of non-professional men upon a great variety of unscientific questions arising every day, and in every judicial inquiry. These are questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, size, age, strength, heat, cold, sickness, and health ; questions, also, concerning various mental and moral aspects of humanity, such as disposition and temper, anger, fear, excitement, intoxication, veracity, general character, and particular phases of character, and other conditions and things, both moral and physical, too numerous to mention. See, in addition to the American cases cited by Judge Doe, in *State* v. *Pike*, *passim*, and the cases cited by the learned counsel for the appellant, in argument, *Commonwealth* v. *Dorsey*, 103 Mass. 412 ; *McIntyre* v. *McConn*, 28 Iowa 480, 483 ; *Dickinson* v. *Dickinson*, 61 Pa. St. 404 ; *Boyd* v. *Boyd*, 66 *ibid.* 283, 286, 290 ; *Pidcock* v. *Potter*, 68 *ibid.* 351 ; 1 Wharton's Cr. Law, sec. 48.

All evidence is opinion merely, unless you choose to call it fact and knowledge, as discovered by and manifested to the observation of the witness.

And it seems to me quite unnecessary and irrelevant to crave an apology or excuse for the admission of such evidence, by referring it to any exceptions (whether classified, or isolated and arbitrary) to any supposed general rule, according to the language of some books and the custom of some judges. There is, in truth, no general rule requiring the rejection of opinions as evidence. A general rule can hardly be said to exist, which is lost to sight in an enveloping mass of arbitrary exceptions.

But if a general rule will comfort any who insist upon excluding and suppressing truth, unless the expression of the truth be restrained within the confines of a legal rule, standard, or proposition, let them be content to adopt a formula like this : *Opinions of witnesses derived from observation are admissible in evidence, when, from the nature of the subject under investigation, no better evidence can be obtained.* No harm can result from such a rule, properly applied. It opens a door for the reception of important truths which would otherwise be excluded, while, at the same time, the tests of cross-examination, disclosing the witness's means of knowlege, and his intelligence, judgment, and honesty, restrain the force of the evidence within reasonable limits, by enabling the jury to form a due estimate of its weight and value. See 1 Redf. on Wills 136–141.

Opinions concerning matters of daily occurrence, and open to common observation, are received from necessity— *Commonwealth* v. *Sturte-*

*vant*, 117 Mass.; and any rule which excludes testimony of such a character, and fails to recognize and submit to that necessity, tends to the suppression of truth and the denial of justice.

The ground upon which opinions are admitted in such cases is, that, from the very nature of the subject in issue, it cannot be stated or described in such language as will enable persons, not eye-witnesses, to form an accurate judgment in regard to it. *De Witt* v. *Barley*, 17 N. Y. 340; BELLOWS, J., in *Taylor* v. *Grand Trunk Railway*, 48 N. H. 309.

How can a witness describe the weight of a horse? or his strength? or his value? Will any description of the wrinkles of the face, the color of the hair, the tones of the voice, or the elasticity of step, convey to a jury any very accurate impression as to the age of the person described? And so, also, in the investigation of mental and pyschological conditions,—because it is impossible to convey to the mind of another any adequate conception of the truth by a recital of visible and tangible appearances,—because you cannot, from the nature of the case, describe emotions, sentiments, and affections, which are really too plain to admit of concealment, but, at the same time, incapable of description,—the opinion of the observer is admissible from the necessity of the case; and witnesses are permitted to say of a person, " He seemed to be frightened;" " he was greatly excited;" " he was much confused;" he was " agitated;" " he was pleased;" " he was angry." All these emotions are expressed to the observer by appearances of the countenance, the eye, and the general manner and bearing of the individual,—appearances which are plainly enough recognized by a person of good judgment, but which he can no otherwise communicate than by an expression of results in the shape of an opinion. See Best on the Principles of Evidence 585. It is on this principle, says Mr. Best, that testimony to character is received; as, where a witness deposes to the good or bad character of a party who is being tried on a criminal charge, or states his conviction that, from the general character of another witness, he ought not to be believed on his oath. Best on Ev. 657. " So," continues Mr. Best, " the state of an unproducible portion of *real* evidence,—as, for instance, the appearance of a building, or of a public document which the law will not allow to be brought from its repository,—may be explained by a term expressing a complex idea, *e. g.*, that it looked old, decayed, or fresh; was in good or bad condition, &c. So, also, may the emotions or feelings of a party whose psychological condition is a question. Thus, a witness may state as to whether, on a certain occasion, he looked pleased, excited, confused, agitated, frightened, or the like."

Considerations of this character controlled the opinion of the court in *De Witt* v. *Barley*, before cited. The learned judge, in delivering the opinion of the court, said,—" To me, it seems a plain proposition, that, upon inquiries as to mental imbecility arising from age, it will be found impracticable, in many cases, to come to a satisfactory conclusion, without receiving, to some extent, the opinions of witnesses. How is it possible to describe, in words, that

combination of minute appearances upon which a judgment in such cases is formed? The attempt to try such a question, excluding all matter of opinion, would in most cases, I am persuaded, prove entirely futile  *  *  . A witness can scarcely convey an intelligible idea upon such a question, without infusing into his testimony more or less of opinion. Mental imbecility is exhibited, in part, by attitude, by gesture, by the tones of the voice, and the expression of the eye and face. Can these be described in language so as to convey to one not an eye-witness an adequate conception of their force?"—and see Rand's note to *Poole* v. *Richardson*, 3 Mass. (Rand's ed.) 330.

The reasons drawn from necessity in cases of this kind are enhanced by the obvious consideration, that oftentimes the testimony of experts, if it may be considered as possessing peculiar value, is, upon the required occasion, unattainable.

In very many forms of derangement, imbecility, idiocy, or more active insanity, the indications of mental disease being apparent to general and ordinary observation, a man of common sense and worldly experience can draw just inferences from them, as well without as with a scientific education.

The question of testamentary capacity is in strictness limited to a very brief period of time—the few minutes occupied by the attestation of the will. Evidence of a previous mental condition is, of course, competent, as tending to show that such previous condition probably continued and existed at the precise moment in question.

But experts are not ordinarily employed, like a corps of detectives, to " work up " the case, by inquiries concerning conditions antecedent to the execution of the will ; neither, I suppose, are they usually brought to the testator's bedside for the purpose of attesting the instrument. It has never been disputed that the subscribing witnesses may testify concerning the actual mental condition of the testator as freely as medical experts, who speak from personal and professional acquaintance, study, and investigation, whether these subscribing witnesses happen to be the attending physicians, nurses, children, or chance strangers ; but why they are admissible, simply as subscribing witnesses, has never been explained satisfactorily ; and no good reason, I apprehend, can be assigned for any distinction in this respect between subscribing witnesses and any other.

In *Beaubien* v. *Cicotte*, 12 Mich. 459, CAMPBELL, J., treating of this subject, says,—" The reasons given by those courts which confine such testimony to these witnesses are based upon the assumption that they are called in for the special purpose of scrutinizing the capacity as well as the acts of the testator. It is matter of every-day experience, that wills made *in extremis* must usually be witnessed by any persons who are conveniently to be found ; and it is not often that much care is taken to procure educated or peculiarly intelligent witnesses ; nor is their attention, in fact, very closely addressed to the question of capacity, beyond what would naturally be the case with any other observers present.

But, be this as it may, the rule assumes that any person of ordinary capacity may form a reliable opinion concerning the condition of another, from simply witnessing the execution of a will which is rudely drawn up or discussed in the presence of the attesting witnesses. It is little short of absurdity to hold that persons, having equal or greater facilities derived from personal acquaintance and long intercourse, are not as competent to form opinions as those who are required to have no opportunity beyond one brief interview." See Mr. Rand's comments upon *Poole* v. *Richardson*, 3 Mass. (Rand's ed.) 330.

Now, as the question of the sanity or insanity of an individual is a question of conduct as well as a question of nosology, as a man is regarded as insane who acts in a way different from that of a majority of his fellows, it might well seem that the evidence of experts in such cases was inadmissible, since there can be no doubt that persons of common sense, conversant with mankind, and having a practical knowledge of the world, if brought into the presence of a lunatic, would in a short time be enabled to form an accurate and reliable opinion, not, perhaps, of the specific and precise character of his insanity as referable to a particular class of the insane malady, but, certainly, in a general way, of his mental unsoundness. See Browne on the Med. Jur. of Insanity, sec. 506. Dr. Ray (Med. Jur. of Insanity, 5th ed., page 626) advises medical witnesses to be prepared with a well-ordered, well-digested, comprehensive knowledge of mental phenomena, in a sound as well as an unsound state, and recommends Shakespeare and Moliere as preferable text-books to Stewart and Locke, showing that it is the practical knowledge of character in its relation to conduct that he regards as the most important requisite, in the way of knowledge, of a medical witness.

I think it will be observed (and to my mind it seems that it must be inevitable) that wherever the rule is enforced, or rather attempted to be enforced, which allows only a recital of appearances to be given, it will be found that such facts inevitably involve opinions which the witness is unable to conceal, and which the utmost vigilance of judges cannot exclude.

These appearances are indeed facts, but they are facts which it is impossible to express, except in a way that shall indicate the opinion of the witness. Such opinions, as I have said, are therefore admitted *ex necessitate.*

It is impossible to prescribe the limits within which opinions are receivable, except by the application of this test: Is the employment of such testimony, from the nature of the case and its circumstances, the only way, or the best practicable way, of discovering the truth?

One hundred and thirty-one years ago, Lord HARDWICKE said, in *Omychund* v. *Barker*, 1 Atk. 19 (S. C. Campbell's Lives of the Chancellors, Hardwicke Ch. 131, vol. 6, page 201, 5th Eng. ed.),—"The judges and sages of the law have laid it down that there is but one general rule of evidence—' the best the nature of the case will admit.'"

"The nature of the case" means, when employed in this connection, something more accurately described as "the nature of the subject."

The authorities cited in *State* v. *Pike*, 49 N. H. 408, 409, and many others (to some of which I shall hereafter refer), show that the understanding and practice of English lawyers and judges always have been and now are perfectly unanimous on the question whether the nature of the mental conditions of calmness and excitement, peace and passion, love and hate, gentleness and ferocity, sobriety and intoxication, health and disease, is such that the opinions of non-experts, formed by personal observation of the appearance and conduct of an individual whose mental condition is in question, is the best evidence of that condition, within the meaning of the rule admitting the best evidence that the nature of the subject admits.

The meaning of the rule is best shown by examples. Nobody ever doubted that a non-professional man could testify that a certain neighbor, whom he had been accustomed to see, appeared one day to be well and the next day to be sick. Although the testimony of a physician, as to some of the details of the apparent health and sickness of that neighbor, might be more satisfactory, and, in a certain sense, better evidence, the opinion of the non-expert on the general question of health and disease, in that case, would belong to the class of the best evidence, within the meaning of the rule. And so, also, with regard to a question of mental condition : a medical expert may be able to state the diagnosis of the disease more learnedly ; but, upon the question whether it had, at a given time, reached such a stage that the subject of it was incapable of making a will or a contract because irresponsible for his acts, the opinions of his neighbors, if men of good common sense, would be worth more than that of all the experts in the country. BREESE, J., in *Rutherford* v. *Norris*, supreme court of Illinois, November 4, 1875—reported in the Chicago Legal News, December 11, 1875.

In the case referred to, the opinions of sixty common-sense witnesses, neighbors of the testator, were received in preference to those of the experts, Judge BREESE remarking,—" We feel confident that we will be more likely to arrive at a just estimate of the mental condition and business capacity of the testator by relying on the accordant testimony of his life-long acquaintances and neighbors, with whom the testator was in frequent intercourse, rather than from the testimony of these medical gentlemen ; and so would the jury." On such questions the testimony of the expert and the testimony of the non-expert would both be the best evidence,—that is, would be parts of the class of best evidence, within the meaning of the rule.

Nobody ever supposed that the rule of the best evidence admitted no opinions of physical condition except those of experts, and confined experts to a description of those physical appearances which were the evidence upon which they formed their opinion of the man's being well or sick.

If the language of the rule were required to be strictly interpreted, one expert would have to be excluded if it were made to appear that another expert was better qualified, because the testimony of the former would not be the best.

When the question is, upon a post-mortem examination and a dissection and chemical analysis of the stomach and its contents, whether the scientific indications in that organ were of the presence and action of arsenic or strychnia, the opinion of a mere lawyer, farmer, or blacksmith would not be the best evidence in any sense, but would be good for nothing; and, as no one would think of asking their opinion on that physiological and chemical question, so no one would think of rejecting their opinion, based on their own observation of the deceased the day before his death, that he then appeared to be well or sick. Suppose, the day before or a week before the death, a lawyer, farmer, and blacksmith saw the deceased, and had an opportunity to see whether he appeared to be well or sick : suppose the lawyer is asked, " Did you observe any indications of his being well or sick ? " and the answer to be, " I observed no indication of his being sick; he appeared as well as usual, as well as I ever saw him: " suppose the farmer is asked, " Did you notice anything unusual in his appearance or conduct ? " and the answer is, " No, I did not: " suppose the blacksmith is asked, " In your opinion, was he well or sick ? " and the answer is, " In my opinion he was perfectly well: his spirits, looks, and behavior, all showed, in my opinion, freedom from weakness and pain:" what legal distinction can be drawn between these questions and answers, to make one competent, and either of the others incompetent ? It is all opinion, and nothing but opinion, of the man's physical condition in relation to health or disease. The use or the omission of the word " opinion," in either of those questions or answers, does not affect the character of the testimony in the slightest degree. Calling such testimony " opinion " does not make it " opinion ; " and calling it something else (as in *Barker* v. *Comins* and *Nash* v. *Hunt*, before cited) does not make it something else. It is opinion, not because the word " opinion " is used, but because it is the judgment of the witness, exercised upon what he personally saw and heard of the deceased, and the conclusion of his own mind upon the question of physical health or disease,—a conclusion formed by the witness, not by the jury, and formed upon sights and sounds which enabled the witness to form an opinion satisfactory to himself, although it is one which he might be unable to describe to a jury so as to enable them to form as satisfactory an opinion as they would if they had seen and heard what the witness saw and heard ; and such evidence is more valuable than the testimony of experts unacquainted with the testator. See Redf. Cases on the Law of Wills 89.

When the witness describes what he saw and heard, as well as he can, his description may (as it often must) fall far short of being the best evidence. *(State* v. *Pike*, 49 N. H. 414, 415, 423.) When he adds to his description the impression made upon his own mind by the things, appearances, and transactions described, the jury have evidence of the class called the best, though it may not be so good as the opinion of a skilful physician. The rule requiring the best evidence relates to its grade only, and not to its conclusiveness. Thus, the evidence of a by-

stander is competent to prove where lines were run in a private survey, though the surveyor be living—*Richardson* v. *Milburn*, 17 Ind. 67. As the opinion of one expert may be better than the opinion of another expert, so the opinion of one farmer may be better than that of another farmer in relation to the quality of a load of hay ; but, coupled with such a description of the hay as they can give, their opinions of its quality are both of the class of evidence called the best, although the fact that well-fed cattle ate the hay very greedily, or that half-starved cattle would not eat it at all, would be better evidence than the opinions or the descriptions given by the farmers. The opinion of one farmer would not be excluded because the opinion of another was better ; and both their opinions would not be excluded because the opinions of the cattle would be better than either of theirs.

In *Darling* v. *Westmoreland*, 52 N. H. 401, 403, the defendants, arguing that evidence of Fletcher's horse being frightened was incompetent, suggested that, " at best, it was evidence of an admission or a declaration, by Fletcher's horse, that the alleged obstruction looked frightful to him, and   *   *   not even a declaration under oath at that." But the court, holding that the fright of Fletcher's horse was as competent as the fright of the plaintiff's, affirmed the doctrine of *Whittier* v. *Franklin*, 46 N. H. 23, that the fright of a horse might be proved by witnesses testifying that he " appeared to be frightened, or that in their opinion he was frightened, or (to omit superfluous words, and speak in that positive manner in which witnesses would generally testify on such a subject) that he *was* frightened "—p. 403.

A non-expert may testify that he thought a horse " was not then sound :   *   *   his feet appeared to have a disease of long standing" — *Willis* v. *Quimby*, 31 N. H. 485, 487 ; that a horse " appeared to be well, and free from disease ; " that he thought " he never saw any indication of the horse being diseased "—*Spear* v. *Richardson*, 34 N. H. 428–431. These two cases relate to the physical condition of a horse. The same doctrine is equally well settled in relation to the mental and moral condition of a horse, so to speak ; for, in *State* v. *Avery*, 44 N. H. 392, 393, it was held—BELLOWS, J.—that a non-expert might testify, on an indictment for cruelly beating a horse, that the horse drove like a pleasant and well-disposed horse, unless when harassed by the whip ; that, at the time of the beating, he saw no viciousness or obstinacy in the horse, and that the blows appeared to affect the horse in a particular manner. The evidence was opinion, and nothing else ; and it was opinion of the mental and moral condition of the horse, judged of by the witness from actions which it was impossible for the witness to describe in any better or more satisfactory way, so as to give the jury the best evidence the nature of the subject permitted.

In *Whittier* v. *Franklin*, 46 N. H. 23, an action for a defective highway,—one point of the defence being that the plaintiff's horse, which he was driving at the time of the accident, was vicious and unsafe, and that the plaintiff's injuries were caused by the vices of his horse,—it was held—BELLOWS, J., delivering the opinion of the court—that a non-

expert who witnessed the accident might testify that he did not see any appearance of fright ; that the horse did not appear to be frightened in the least before he went off the bank, or afterwards ; that he appeared to be rather a sulky dispositioned horse to use." Judge BELLOWS cites *People* v. *Eastwood*, 14 N. Y. 562, where it was held that opinions as to whether a person is intoxicated may be received ; *Milton* v. *Rowland*, 11 Ala. 732—opinions as to the existence of disease, when perceptible to the senses ; *Bennett* v. *Fail*, 26 Ala. 605—opinion that a slave appeared to be healthy ; and other cases in relation to opinions of a healthy or sickly condition of body.   He also cites *Spear* v. *Richardson* and *Willis* v. *Quimby*, before referred to, as to opinion of health of horses.   The very learned judge says that the substance of the statement of the witness is, that the horse did not appear to be frightened, but appeared to be sulky ; that, on such subjects, persons of common observation may and do form opinions, that are reasonably reliable in courts of justice, from marks and peculiarities that could not in words be conveyed to the minds of jurors, to enable them to make the just inferences ; that it is much like the testimony that a horse appeared well and free from disease, or that a person appeared to be healthy, or intoxicated—p. 26.   The evidence was held admissible as an *opinion*.

What reason is there for allowing a witness to testify that a horse appeared to have a sulky disposition, and not allowing the same witness to testify that a man appeared to have a similar disposition ? What difference whether the witness says, " He appeared to have a sulky disposition " ? or, " In my opinion, based upon my own observation of him, he had a sulky disposition " ?

A non-expert may give his opinion on the physical health of a man, as well as on the physical health of a horse—*State* v. *Knapp*, 45 N. H. 148–150 ; may give his opinion not only that a horse did not appear to be frightened, but also that a lady did not seem to be frightened or excited—*Taylor* v. *Railway*, 48 N. H. 304, 306, 309.

The opinion of non-experts in relation to mental condition is not limited to the question of a mental disturbance caused by fright.   In *Bradley* v. *Salmon Falls Manuf'g Co.*, 30 N. H. 487, 491, it was held that a non-expert might testify that the plaintiff " seemed satisfied " with a business arrangement proposed to him by the witness.

In *McKee* v. *Nelson*, 4 Cow. 355, it was held that, in an action for a breach of promise of marriage, a witness, who knew the plaintiff and had observed her conduct and deportment towards the defendant, was permitted to express his opinion that the plaintiff was sincerely attached to the defendant,—" a fact," said Judge SELDEN, " which it is plain could be proved in no other way ; " and this decision was cited as undoubted law by Judge PARKER, in *Robertson* v. *Stark*, 15 N. H. 114, 115.   In *McKee* v. *Nelson*, the court say,—" There are a thousand nameless things, indicating the existence and degree of the tender passion, which language cannot specify"—precisely what Judge BELLOWS, in *Whittier* v. *Franklin*, said of the frightened mental condition and sulky disposition of a horse.

Better illustrations, I think, could not be had of the meaning of the rule, admitting the best evidence.

A boy works many years on a farm: and the question arises, What was the value of his services? Suppose he is dead, as is the subject of inquiry in this and every testamentary case: one of the material questions would be whether the boy was bright or stupid, amiable or morose. What evidence on these points would be so satisfactory as the opinions of the intelligent and disinterested farmers in the neighborhood, who knew him well? If there was a general concurrence in their opinions, one way or the other, would it not be decisive?—and, if there was not a concurrence, would not the cross-examination as to the grounds and reasons of their opinions generally show the facts much better than any statement of facts without opinions?

What facts without opinion can any parent state as to his own children, to give a stranger any such tangible and satisfactory information of their mental and moral peculiarities as is given by an expression of his opinion?

Of very many states of mind, as we have already seen, the opinions of non-experts are competent evidence. What lawyer of considerable experience or observation, in the courts of this or any other jurisdiction, has not heard such evidence given without objection, and no objection made, because every lawyer and judge felt that it was the best evidence?

A man is tried for the murder of his wife: it is material to know how his mind was affected when he was first informed of her death. A witness, who says he told the prisoner of it, is asked how the prisoner was affected: the answer is, "He was very much overcome;" or, "He seemed very much overcome;" or, "I thought he was deeply affected;" or, perhaps, "The news did not disturb him at all;" or, "He showed no signs of grief;" or, "I saw no indications of sorrow;" or, "He seemed depressed and gloomy." Did anybody ever object to such evidence? and, if any objection was ever made on the ground that it was a matter of opinion, was the objection ever sustained? Was such evidence ever excluded here or anywhere else? Evidence of this character was received a few weeks ago, in the trial of Magoon, for murder, in Rockingham county, without the intimation of a doubt concerning its competency; and the very able and vigilant counsel, upon both sides in that cause, knew what they were about, and omitted nothing of their duty to the prisoner or to the public.

And such evidence is not confined to the various mental conditions of health; it is also received in relation to mental disease. They who attended the death-bed of a testator are called to testify concerning his mental condition. One says,—"A week before his death he was sick and confined to his bed—very weak—not able to sit up, but in other respects he appeared as usual." "As usual" means, in such a case, sane, sound in mind, of a healthy mental condition. "He appeared natural," is the universal expression of ordinary witnesses testifying to sanity. "If 'unnatural,' by its peculiar use in this con-

nection (said Judge DOE), should, in evidence, come to be synonymous with 'insane,' as 'natural' is understood to be synonymous with 'sane,' the legal question now under consideration would dwindle to a point of literary taste." *State* v. *Pike*, 49 N. H., at page 427; and see *Boardman* v. *Woodman*, 47 N. H., at page 146.

But one witness says,—" He did not appear as usual : he did not appear natural." Now let us imagine a scene that might very probably be exhibited in any court where the Massachusetts rule prevails :

" Very well," says a learned barrister, " very well. Mr. Witness, you may say that,—that is quite regular,—that is your opinion. Now tell us in what respect he did not appear ' as usual,' or ' natural.' " " Well, I can't describe it, but I should call it wandering, delirious ; he was incoherent in his talk." " Very well, Mr. Witness, you acquit yourself like a sensible man. Now tell the jury whether, in your opinion, he was then of sound mind." " I object !" thunders the learned barrister on the other side. " I object !" exclaims the opposing junior— " counsel know better. It is an insult and outrage to put such a question." " I object !" " I object !" echoes from every side. The court-room is in an uproar. The judge has to exert himself to restore order and keep the peace. The lawyers on each side are all talking at the same time in a very delirious and incoherent manner. The witness is confounded. The jury are confounded. Everybody is confounded, except those who understand that " incoherence of thought " and " delirium," vulgarly called " wandering," is not a state of mental unsoundness,—is not mental disease ; and that " as usual," or " natural," is not a condition of mental health. Whether it is such condition or not, is a question then solemnly debated. After a profound discussion by counsel, and a thorough consideration by the judge, he rules that the witness may say that the deceased was delirious, but must not say he was of unsound mind, because the witness, not being an expert, is not qualified to form an opinion on the general question of mental health or mental disease.

That ruling is made in Maine (because it was once a part of Massachusetts), in New Hampshire, in Massachusetts, and in Texas (*Jehrke* v. *The State*, 13 Texas 568), and nowhere else in the civilized world.

At the close of the scene which I have described, not a man of the city goes out of the court-room without being disgusted with this exhibition of the law, as a system of arbitrary rules, that, ignoring all legal ideas, decides upon a distinction purely verbal. And why should not the laymen be disgusted with the senseless subtlety which permits one party to show by his witness that a testator " appeared perfectly natural," and forbids the adverse party to offer the testimony of another witness that " he didn't appear to be in his right mind " ?

In the case now before us, the learned judge and his associates, to whom the trial was referred, evidently and inevitably experienced great embarrassment and confusion of mind in their effort to conform to the supposed rule. The futility of their endeavors is notably apparent.

Mr. McAlpine was permitted to say of the testator, " He seemed to

be all broken down in body," but was forbidden to say, " He seemed to be all broken down in mind;" and yet, the same witness (without specification of mental or bodily infirmity) was permitted to say that, between certain dates, " he had changed very much;" "his mind was such that he could not give any intelligent answer;" " he didn't seem to have any memory;" "I discovered that he had failed;" " his conversation was childish."

The following questions were ruled out:

First. " Being a brother of Joseph Hardy, from your observation of his appearance and conduct at the time you saw him at your house, in June, 1869, state whether or not, in your opinion, he was at the time of sound and disposing mind and memory."

Second. " Being a brother of the testator, from what you had observed as to his conversation, conduct, and general deportment as to all subjects, up to the 26th day of July, 1870, have you any opinion as to his sanity at that date, and if so, what is it?"

Mr. Hardy was not allowed to say that the testator " appeared like a failing man in every respect."

Another witness was forbidden to testify that the testator " appeared like a man who didn't seem to know what he was talking about half of the time;" but he was allowed to state that " he appeared very weak in his mind."

Another non-expert was permitted to testify, " He appeared childlike,—appeared feeble in body and mind,—more like a child than a rational man;" but another witness was not allowed to state, " It looked to me as though he was failing in his business capacity, or in his mind."

And, finally, another witness, being expressly cautioned and charged to beware of expressing any " opinion," was permitted to say,—" I observed nothing whatever, in his conduct or conversation, indicating any impairment of any of his mental faculties."

The Massachusetts rule is, that non-experts' opinions shall be excluded; but the rule itself does not exclude them. It only excludes the use of certain words. It admits the opinions, and merely embarrasses the witness and confounds the jury by requiring the witness to express his opinion without using certain forbidden terms, and by using others that are understood by the jury and everybody else to be precisely synonymous. A non-expert, who has been watching by the bedside of a sick man, may say, " He was delirious all night;" a farmer may say that his neighbor's boy is so lacking in intelligence as to be " below par;" anybody may say that a man was " crazy drunk;" that a testator didn't seem to understand anything that was said to him—seemed senseless, unnatural, not as usual; or, that " no change was perceptible in his intelligence," " no incoherence of thought," nor anything unusual or singular in respect to " his mental condition;" was healthy or sickly in body;—but in giving his opinions of mental health or disease, the non-expert must not use the words " sane," " insane," " mentally disordered," or " deranged." So far as he can find syno-

nymes for these words, circumlocutory but equivalent, he may express his opinion in them, and welcome; but let him beware of using those cabalistic words, on pain of the displeasure of those who understand that such terms as "delirious" and "idiotic" are not expressive of an opinion of the presence and operation of mental disease.

Whether "out of his head" is one of the phrases in which a non-expert may give his opinion, or whether it is one of the forbidden caballa, is a question concerning which information is wanting.

The selection of the phraseology in which such an opinion may be expressed, and that in which it cannot be uttered, depends on no legal principle, but on the mere whim of the court. Such an arbitrary and senseless choice or rejection of terms in which to express an admissible opinion, is mere, sheer logomachy, a waste of precious time given us for better purposes, a verbal quibble unworthy of the law, and calculated to bring it into contempt.

It would be superfluous for me to add that I fully concur in the views and opinions expressed by Judge DOE in *Boardman* v. *Woodman* and *State* v. *Pike*, and that I cordially endorse the remarks of Judge RED-FIELD (11 Am. Law Reg., n. E, page 259), as follows: "The learned judge shows very conclusively, both upon authority and reason, that the opinion of the unprofessional witnesses, in such a case, is commonly far more reliable as a basis of ultimate decision, in questions of sanity and mental capacity, than any specific facts which could possibly be gathered from the witnesses. We have said in our book on wills, and in other places, all that we could desire to say, both as to the rationale of the rule, and the support which it receives from authority. The tendency of the American courts in the last few years has been largely in the direction contended for by the learned judge; and there seems to be little question that it must ultimately prevail all but universally. We should rejoice at such a result, as greatly tending towards the establishment of truth with greater facility and certainty in a very important class of cases."* See 1 Redf. on Wills (4th ed., A. D. 1876) 138–145, where many other cases than those hereinbefore alluded to are cited and commented upon.

Thus supported upon principle and authority, I am satisfied that the time has arrived when this court is called upon to declare the law to be in conformity with the views I have expressed.

LADD, J. I think it is shown by proofs which fall little, if at all, short of demonstration, that the doctrine excluding the opinions of non-experts on the question of insanity has grown up in this state within the memory of men now living in the profession; that it had no place in

---

* Judge REDFIELD, in the Law of Wills (ed. of 1876, n. 23, *145), referring to *Hardy* v. *Merrill*, says,—"There will now remain scarcely any dissentients among the older states; and those of recent origin, whose decisions have been based upon the authority of the earlier decisions of some of the older states, which have since abandoned the ground, may also be expected to change."

<div align="right">REPORTER.</div>

the common law brought here from England, nor in the jurisprudence or practice in this state, from the constitution down to a comparatively recent date; that it is contrary to reason, extemely difficult of application, and inconvenient in practice; that the great weight of judicial opinion and authority outside this state is against it; and that, even if we look at the condition of authority as shown by the expression of judicial opinion and practice in this state, the balance cannot fairly be said to be in favor of the rule. No titles are to be disturbed by adopting a rule more consonant with reason, and which accords with the almost universal practice in jurisdictions where the common law is used the world over. I therefore concur fully with my brother FOSTER in the conclusions at which he has arrived.

CUSHING, C. J., concurred.

*Case discharged.*